Danny Joe BRADLEY, Petitioner-Appellant,

v.

John E. NAGLE, Warden, et al., Respondents-Appellees.

No. 99-6178.

United States Court of Appeals,

Eleventh Circuit.

May 16, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (No. 93-B-0958-S), Sharon Lovelace, Judge.

Before EDMONDSON, BIRCH and BARKETT, Circuit Judges.

BARKETT, Circuit Judge:

Danny Joe Bradley appeals the denial of his petition for habeas corpus, filed pursuant to 28 U.S.C. § 2254. On appeal, Bradley asserts the same claims for relief asserted before the district court:

1.  His conviction was obtained by use of evidence gained pursuant to an unlawful arrest and an unconstitutional search and seizure, in violation of the Fourth, Fifth, and Fourteenth Amendments.

2.  The State violated his due process rights by failing to disclose material exculpatory evidence which was in its possession and which was sought in discovery by Bradley's counsel prior to trial.

3.  His conviction should be reversed because the evidence was insufficient to support the finding that he committed a murder "during the commission" of a rape or sodomy in the first degree (*i.e.,* a sexual offense involving "forcible compulsion") and thus the conviction violates the Fourteenth Amendment.

4.  His sentence violates the Eighth Amendment because the evidence did not support the application of the statutory aggravating circumstance that the capital offense was committed while he was engaged in the commission of a rape.

5.  His sentence violates the Eighth Amendment because the evidence did not support the application of the statutory aggravating circumstance that the offense of which he was convicted was "especially heinous, atrocious or cruel compared to other capital offenses."

BACKGROUND

On January 24, 1983, twelve-year-old Rhonda Hardin and her younger brother, Gary "Bubba"

Hardin, were left in the care of their stepfather, Danny Joe Bradley. The children's mother, Judy Bradley, had

been hospitalized for more than one week. The children normally slept in one bedroom of the residence and Danny Joe Bradley and Mrs. Bradley in another. On the night of January 24, 1983, Jimmy Isaac, Johnny Bishop, and Dianne Mobley went to the Bradley home where they saw Rhonda and Bubba together with Danny Joe Bradley. When Bishop, Mobley, and Isaac left the Bradley home at approximately 8:00 p.m., Rhonda was watching television with Bubba and Bradley. Rhonda was lying on the couch, having taken some medicine earlier in the evening. She asked Bubba to wake her if she fell asleep so that she could move to the bedroom. When Bubba decided to go to bed, Bradley told him not to wake Rhonda but to leave her on the couch. Bradley also told Bubba to go to sleep in the room normally occupied by Mr. and Mrs. Bradley instead of his own bedroom.

At approximately 11:30 p.m., Bradley arrived at the home of his brother-in-law, Robert Roland. Roland testified that Bradley arrived driving his automobile and that he was "upset" and "acted funny." Roland testified that Bradley "talked loud and acted like he was nervous and all, which [Roland] had never seen him do before." Bradley's father-in-law, Ed Bennett, testified that Bradley came to his house at approximately midnight and told him that Rhonda was gone. Bradley's next-door neighbor, Phillip Manus, testified that at approximately 12:50 a.m., Bradley appeared at his home. Manus testified that Bradley told him that he and Rhonda had argued over some pills Rhonda wanted to take. He claimed that he had fallen asleep and when he awoke, Rhonda was missing. Bradley then said "[l]et me run over to Rhonda's grandma's house and I'll be back in a few minutes." Bradley returned ten or fifteen minutes later. Manus suggested that they walk to the hospital to tell Judy Bradley that Rhonda was missing. Manus testified that Bradley wanted to go to the hospital rather than report Rhonda's disappearance to the police. Manus and Bradley waited at the hospital for one and one-half hours before they were able to enter Mrs. Bradley's room. Throughout that period of time, Manus tried to persuade Bradley to go to the police station to report that Rhonda was missing. When the men eventually saw Mrs. Bradley, she told Danny Joe Bradley to report Rhonda's disappearance to the police.

2

Manus and Bradley went to the police station where Bradley told Officer Ricky Doyle that Rhonda was missing. Bradley also told Officer Doyle that he and Rhonda had argued earlier in the evening and that she had left the house sometime around 11:00 or 11:30 p.m. Bradley claimed that he had fallen asleep and that when he awoke, Rhonda was gone. He stated that he left the house at 11:30 p.m. to go to his neighbor's house to look for Rhonda. Bradley specifically indicated that he had not left the house until he began looking for Rhonda and that he went to the Manus home when he learned that Rhonda was missing. After talking with Officer Doyle, Bradley and Manus returned to Manus's apartment.

At approximately 7:30 a.m. on January 25, 1983, Rhonda's body was found in a wooded area less than six-tenths of a mile from Bradley's apartment. Rhonda's body was dressed in a pair of maroon-colored corduroy pants, a short-sleeved red knit shirt, green, white, brown, and purple striped leg warmers, a bra, and a blue windbreaker. Rhonda's tennis shoes were tied in single knots. Several members of her family testified that she always tied her shoes in double knots.

Within ninety minutes after Rhonda's body was discovered, two plainclothes officers from the Piedmont Police Department arrived at Bradley's residence. The officers had neither an arrest warrant nor probable cause. Although the government contends that Bradley was not placed under arrest at that time, Bradley claims that he was told he was under arrest for suspicion of murder, handcuffed, placed in a police vehicle, and taken to the Police Station, where an interrogation began at around 9:30 a.m. Bradley was in the custody of the Piedmont Police from that time until approximately 4:00 a.m. on the following morning. During this period of almost nineteen hours, the officers read Bradley his *Miranda* rights and questioned him. Bradley told the police that he had discovered Rhonda missing at approximately 11:20 or 11:25 p.m. and had gone to Phillip Manus's house in search of her. He also told officers that he had not left the apartment until he began his search for Rhonda.

In addition to giving a statement, Bradley executed a consent-to-search form authorizing the police to search his residence and his automobile, submitted to fingernail scraping, and was transported to and from

3

Birmingham, Alabama. While in Birmingham, he submitted to a polygraph test and blood and saliva tests, and gave his clothing to the authorities. Although Bradley cooperated with the police in their investigation during this time period, he claims that he did so because the police clearly indicated to him that he would remain in police custody unless he cooperated. After obtaining the consent-to-search form, the police searched his residence and his automobile, seizing several items of physical evidence. Among the seized items of evidence were a pillowcase, a damp blue towel from a bathroom closet, the living room light switch plate cover, a red, white, and blue sheet from the children's bedroom, a white "heavy" sheet from the washing machine, and fiber samples from the trunk of Bradley's automobile. Prior to the trial, the court denied Bradley's two motions to suppress this evidence.

At trial, the State presented testimony that, contrary to Bradley's statements to police on both January 24 and January 25, 1983, Police Officer Bruce Murphy had seen Bradley in his car at 9:30 p.m. in the area where Rhonda's body was discovered. Officer Murphy, who had known Bradley for more than twenty years, positively identified him. The State's forensic evidence demonstrated that Bradley's fingernail scrapings matched the red, white, and blue sheet taken from the children's bedroom, the fibers from the leg warmers found on Rhonda's body, and the cotton from the pants Rhonda was wearing on January 24, 1983. The State also proved that fibers found in the trunk of Danny Joe Bradley's car matched the fibers from Rhonda's clothing. A pathologist testified that Rhonda's body had "evidence of trauma—that is, bruises and abrasions on her neck." She had seven wounds on her neck; the largest was an abrasion over her Adam's apple. The pathologist testified that he had taken swab and substance smears from Rhonda's mouth, rectum, and vagina. He also removed the gastric contents from Rhonda's stomach and turned them over to the toxicologist.

An expert in forensic serology testified that Danny Joe Bradley and Rhonda Hardin were of type O blood. Bradley is a non-secretor of the H-antigen. Rhonda was a secretor. The serology expert testified that the H-antigen was not present in the semen taken from the rectal swab of Rhonda. The rectum does not produce secretions or H-antigens. On the inside of Rhonda's pants, a stain containing a mixture of

4

fecal-semen was found with spermatozoa present. The pillowcase found in the bathroom revealed high levels of seminal plasma and spermatozoa consistent with the type O blood group. There were small blood stains on the pillowcase mixed with saliva. These stains were also consistent with an O blood group.

The red, white, and blue sheet on the bed in the children's bedroom contained a four by two and one-half inch stain which included spermatozoa. The white blanket which had been placed in the washing machine also had two large stains consistent with fecal-semen. In both stains, spermatozoa was present and no H-antigens were detected. A combination of semen and sperm with the H-antigen was found on the blue towel located in the bathroom. Although the written report indicated that the blue towel contained a fecal-semen stain containing the H-antigen, the expert testified at trial that her analysis revealed that the towel contained a vaginal-semen stain not a fecal-semen stain and that the word fecal instead of vaginal had been essentially a scriveners' error.[1] She testified that because the blue towel contained a vaginal semen stain, the H-antigen secretions could have come from Rhonda's vaginal secretions. The serologist testified that the low level of H-antigen was consistent with a female secretor because the H-antigen is present in low levels in the vagina. The mattress cover contained a number of seminal stains.

At trial, Bradley's sister-in-law also testified that a day after Rhonda's funeral she heard Bradley say "I know deep down in my heart that I done it," and Bradley's stepson, Bubba Hardin, testified that Bradley had frequently rendered the children unconscious by squeezing their necks.

Bradley testified in his own defense. He explained his inconsistent statements to police by suggesting that he had left his home at the time he was observed by Officer Murphy, because he had intended to steal a car, remove its motor, and sell it. He claimed that Gary Hardin, the father of Bubba and Rhonda, had asked him to obtain such a motor. Hardin testified that he had made no such request.

---

[1] Had it been a fecal-semen stain containing the H-antigen, it could not have come from either Bradley or Rhonda as Bradley was a non-secretor and the rectum does not secrete the H-antigen.

5

The jury returned a verdict of guilty of capital murder on counts one and three of the indictment. These counts charged murder during the commission of a rape or sodomy in the first degree. The same jury deliberated in the punishment phase and recommended twelve to zero that Bradley be sentenced to death. Bradley's conviction, which was predicated on Alabama Code § 13A-5-40(a)(3) (1975), was affirmed by the Alabama Court of Criminal Appeals on November 26, 1985. *Bradley v. State,* 494 So.2d 750 (Ala.Crim.App.1985). The Court of Criminal Appeals denied rehearing on January 7, 1986. The Supreme Court of Alabama affirmed Bradley's conviction 5-4 on July 25, 1986. *Ex parte Bradley,* 494 So.2d 772 (Ala.1986). Rehearing was denied on September 12, 1986. Bradley filed a petition for writ of certiorari before the Supreme Court of the United States which was denied on March 9, 1987, with Justices Brennan, Marshall, and White dissenting from the denial. *Williams v. Ohio,* 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987).

On June 4, 1987, Bradley filed a Petition for Writ of Error Coram Nobis and/or Motion for Relief from Judgment. On January 9, 1989, the Circuit Court for Calhoun County, Alabama denied Bradley's petition for extraordinary relief. The Alabama Court of Criminal Appeals affirmed. *Bradley v. State,* 557 So.2d 1339 (Ala.Crim.App.1989). A petition for writ of certiorari to the Alabama Supreme Court was denied in February of 1990. The United States Supreme Court denied certiorari, with Justice Marshall dissenting. *Bradley v. Alabama,* 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990). Bradley then filed this petition for habeas corpus in the district court pursuant to 28 U.S.C. § 2254. The district court denied the petition, and Bradley now appeals. For the reasons that follow, we affirm the district court's denial of relief in this case. We address each claim in turn.

DISCUSSION

I.     *Claim 1: The conviction should be reversed because evidence was obtained pursuant to an illegal arrest.*

 In his first argument, Bradley asserts that neither his statement nor the evidence obtained from his home should have been admitted at trial because both were obtained in violation of the Fourth and Fifth

Amendments to the Constitution. As to Bradley's argument that his Fourth Amendment rights were violated, we find that the district court correctly ruled that it was precluded from reviewing that claim. The Supreme Court, in *Stone v. Powell,* has held that federal courts are precluded from conducting post-conviction review of Fourth Amendment claims where state courts have provided "an opportunity for full and fair litigation" of those claims. 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

In *Stone,* the Court reasoned that, so long as a defendant has had the opportunity to present his Fourth Amendment claims to the state trial and appellate courts, the objectives of the exclusionary rule have been satisfied. This Court's predecessor has held that "full and fair consideration" in the context of the Fourth Amendment includes "at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute." *Caver v. Alabama,* 577 F.2d 1188, 1191 (5th Cir.1978).[2]

Bradley does not contend that he was denied the opportunity to present facts to the trial court or to argue the issue before an appellate court, and in fact he did so. Rather, he argues that the procedural bar of *Stone* should not apply here because the Alabama courts applied the law incorrectly in evaluating his claim. The Alabama Court of Criminal Appeals determined that Bradley's statement and consent-to-search were sufficiently attenuated from Bradley's illegal arrest to render them admissible under the Fourth Amendment. In so concluding, the court relied heavily on the fact that, prior to his arrest, Bradley had initiated contact with the police, had made statements materially similar to those made after the arrest, and was generally cooperative. Given this pre-arrest conduct, the court concluded that Bradley had his own motives for continuing to cooperate with the police, and that such cooperation was therefore not the result of the illegal arrest. Although another court might not agree that Bradley's pre-arrest conduct could serve as an "intervening event" for the purposes of demonstrating attenuation between the illegal arrest and the statements

---

[2]We have adopted the decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981, as binding precedent of the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

7

Bradley gave, the Alabama courts did fully consider Bradley's claims and the caselaw on which he relied, and having done so, based their rulings on cases which did hold that pre-arrest conduct could be considered as an intervening event. We cannot now say that Bradley was denied a full and fair opportunity to litigate his Fourth Amendment claims, even were we to disagree with the state courts' analysis or conclusion. To do so would vitiate the Supreme Court's decision in *Stone,* which we are not empowered to do.

Bradley also argues that the statement he gave to police while in custody should have been suppressed under the protection of the Fifth Amendment because it was involuntary. It is clear that when Bradley was taken in handcuffs without a warrant to the police station, he was in fact arrested, and the arrest was illegal. The district court, and the Alabama Court of Criminal Appeals before it, so held on the grounds that the police had neither a warrant nor probable cause to arrest.

Because Bradley was illegally arrested, in order the satisfy the protections of the Fifth Amendment, the State had to prove that any evidence obtained pursuant to that arrest was purged of the taint of illegality, or was given knowingly, intelligently, and voluntarily. Bradley does not claim that his waiver was unknowing or unintelligent. Rather, he claims that his waiver was not voluntary because the police told him that the sooner he cooperated, the sooner he would be allowed to leave. Thus, our inquiry is limited to the question whether "relinquishment of the right was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Dunkins v. Thigpen,* 854 F.2d 394, 398 (11th Cir.1988) (quoting *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

To support his position, Bradley directs us to *United States v. McCaleb,* 552 F.2d 717 (6th Cir.1977), in which the Sixth Circuit held that, for the purposes of analyzing voluntariness under a Fourth Amendment claim, the fact that the defendants had been told that they would remain in detention if they did not consent to a search was a relevant factor in assessing the voluntariness of a consent to search. We do not find *McCaleb* persuasive because it is quite dissimilar to the case before us. In *McCaleb,* the totality of the circumstances indicated only that the illegally arrested citizen merely unlocked his suitcase after the detaining

8

officers told him that he and his companions would remain in detention until the officers obtained a warrant. Neither an oral consent nor a consent in writing was obtained by the officers. The court in that case found that the circumstances did not reflect a free and voluntary consent.

In this case, Bradley was cooperative during his extensive conversations with the police and ultimately expressed his consent to allow the police to search his car and his home affirmatively by agreeing orally and in writing. Bradley allowed the police to collect fingernail scrapings, blood, and saliva samples. He also submitted to a polygraph examination. Moreover, the detaining officers did not indicate to him that they would obtain a search warrant absent his cooperation, and, as the Alabama state courts noted, after being informed of his *Miranda* rights before giving his statement and signing a consent-to-search form, Bradley expressly stated that he did not need a lawyer because he had "nothing to hide." We recognize that the giving of a *Miranda* warning is not necessarily dispositive of the question of voluntariness. However, the suggestion that cooperation would yield a speedier release, when considered under the totality of the circumstances here, does not constitute sufficient "police overreaching or coercion" to invalidate Bradley's waiver of his *Miranda* rights. *Dunkins,* 854 F.2d at 399.

II.      *Claim 2:  The conviction should be reversed because the State violated Brady v. Maryland.*

Bradley contends that the State suppressed three items of exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the exclusion of the evidence was sufficiently prejudicial to warrant a new trial under *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The allegedly withheld items of evidence were:  1) the identity of the person to whom a Rickey McBrayer allegedly said that he had killed Rhonda;[3]  2) notes taken by the police concerning a call

---

[3]Although the prosecution told Bradley that McBrayer had confessed, they did not disclose the identity of the person to whom McBrayer had confessed.

from an anonymous woman saying that a Keith Sanford killed Rhonda; and 3) the fact that the police had received a note stating that a Ricky Maxwell killed Rhonda.[4]

In order to demonstrate a *Brady* violation, Bradley must prove 1) that the evidence was favorable to him because it was exculpatory or impeaching; 2) that the evidence was suppressed by the State, either willfully or inadvertently; and 3) that the evidence was material and, therefore, that the failure to disclose it was prejudicial. *See Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Under *Brady,* excluded evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Moreover, the materiality inquiry should be applied to the "suppressed evidence considered collectively, not item-by-item." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. For the purposes of determining whether reversal is warranted, we assume without deciding that all three items of evidence should have been disclosed to Bradley's counsel. We conclude nonetheless that the district court did not err in determining that there was no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

The district court found that none of the evidence in question was material because 1) hearsay rules would prohibit its introduction at trial, 2) the items of evidence did not undermine the reliability of the evidence on which Bradley was convicted, 3) Bradley's trial counsel expressed doubts as to how helpful the evidence might have been, and 4) the State investigated each lead and found that none of the three suspects was involved in Rhonda's murder.

Each item of evidence was in fact inadmissible at trial under Alabama Rules of Evidence. *See Johnson v. Alabama,* 612 So.2d 1288, 1293 (Ala.Crim.App.1992). Thus, in order to find that actual prejudice occurred—that our confidence in the outcome of the trial has been undermined—we must find that the

---

[4]Sheriff's deputies from Cherokee County, Alabama, received the note from an Anita Kay Beecham while she was reporting being assaulted by her live-in boyfriend, Ricky Maxwell.

10

evidence in question, although inadmissible, would have led the defense to some admissible material exculpatory evidence. *See Spaziano v. Singletary,* 36 F.3d 1028, 1044 (11th Cir.1994) ("A reasonable probability of a different result is possible only if the suppressed information is itself admissible evidence or would have led to admissible evidence."). The State contends that no such evidence would have been obtained had the prosecution disclosed these items of evidence. Their argument was based in part on the fact that, at the post-conviction hearing on Bradley's *Brady* claims, the prosecution presented evidence that police investigation pursuant to those leads led prosecutors to conclude that McBrayer, Sanford, and Maxwell were not legitimate suspects in the case. Serology evidence suggested that McBrayer could not have been the person who raped or sodomized Rhonda, and the prosecution contended that both Sanford and Maxwell had alibis for the night of Rhonda's murder.

Bradley counters that, had he been aware of the evidence, he might himself have uncovered evidence that these men were involved in the rape and/or murder of Rhonda that the prosecution failed to uncover. Failing that, he might have presented to the jury the evidence that other suspects existed and, suggesting that the investigation into those suspects was not robust, he might have successfully created a reasonable doubt in jurors' minds as to his guilt.

In assessing this claim, it is important to keep in mind that Bradley need not prove that it is more likely than not that he would have received a different verdict with the evidence, "but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The question is not whether there would have been sufficient evidence to support a guilty verdict had the exculpatory evidence been included, but rather whether the favorable evidence, taken as a whole, puts the case "in such a different light as to undermine the confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555. Based on this record, we cannot say that such a lack of confidence in the verdict exists here. Moreover, Bradley presents only speculation that he would have uncovered any admissible evidence from these three hearsay leads. Nor can we say that, had the jury heard

11

evidence of the existence of these tenuous and ultimately fruitless police suspicions, and weighed that evidence with all the evidence against Bradley, they would have reached a different conclusion. Considering all the undisclosed evidence as a whole, we are unable to say that this verdict is not worthy of confidence.

III.	*Claim 3A: The conviction should be reversed because the evidence was insufficient to support a conviction that Bradley committed murder during the commission of rape or sodomy.*

Bradley was convicted of murder during the commission of a rape in the first degree and murder during the commission of sodomy in the first degree. He now contends that there was insufficient evidence to support a jury finding beyond a reasonable doubt that he murdered Rhonda *during* a rape or sodomy. Under Alabama law, in order to find that Bradley committed murder during the commission of a rape, the jury must have found that he committed the murder "in the course of, or in connection with, or in immediate flight from" raping or sodomizing Rhonda. Ala.Code § 13A-5-39 (1975).

Bradley suggests that this claim falls under the line of cases beginning with *Jackson v. Virginia,* which held that a defendant is entitled to habeas relief "if it is found upon the record evidence adduced at the trial that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In viewing the evidence in the light most favorable to the prosecution, as we must under *Jackson, id.* at 319, 99 S.Ct. 2781, the record reflects that:

- Rhonda was observed by at least three people to be watching television in her home prior to 8:15 p.m. on the night she was murdered.

- Around 9 p.m., Rhonda's brother Bubba was told by Bradley not to wake the sleeping Rhonda and not to sleep in the room Bubba and Rhonda shared, but instead to sleep in Bradley's bed.

- Around 9:30 p.m., Officer Bruce Murphy saw Bradley in his car in the area where Rhonda's body was later discovered, contradicting Bradley's statement that he had not left the house until 11:30 p.m.

- At approximately 11:30 p.m., Bradley arrived at the home of his brother-in-law, who later testified that Bradley was upset and "act[ing] funny."

- When Rhonda's body was discovered the next morning, it was clothed in the clothing she wore the previous day. However, her shoes were tied in single knots while several family members testified that she always tied them in double knots, suggesting that she had been clothed after her death.

12

- Examination of Rhonda's body found semen in her mouth, anus, and vagina. Semen was also found in her stomach, suggesting that she had swallowed or been forced to swallow semen before she was murdered.[5]

- Several bruises were found around her neck, and it was found that strangulation was the cause of her death.

- Bubba testified that Bradley had frequently rendered him and Rhonda unconscious by squeezing their necks.

- Forensic analysis of bedding and items of clothing taken from Bradley's home suggested that the rape and sodomy had taken place in the home. One of the sheets was taken from the washing machine and another from a closet.

- Fibers taken from Bradley's trunk were generally consistent with the clothing Rhonda was found to be wearing, suggesting that she had been in his trunk that night.

- A witness at trial testified that he had heard Bradley say, "I know deep down in my heart that I done it."

Given this evidence, the jury could reasonably have concluded that Bradley raped and sodomized Rhonda. They could also have concluded that he dressed her after her death and transported her in the trunk of his car. They could also have concluded that these events transpired between approximately 9 p.m., when Bubba went to bed, and 9:30 p.m., when officer Murphy saw Bradley in his car, or at most 11:30 p.m., when Bradley appeared at his brother-in-law's home. Bradley correctly points out that the prosecution presented no testimony about the approximate time of Rhonda's death or about the approximate time of the sexual activity in question. But given this relatively narrow window of time, it would not be unreasonable for the jury to have concluded that the murder and sexual activity all occurred during that time frame, that they were perpetrated by Bradley, and that Bradley committed the murder "in connection" with, if not "in the course of" raping and sodomizing Rhonda.

_____

[5]This detail is significant because, under Alabama law, it is not a capital offense to rape or sodomize a person after murdering them if the rape or sodomy is "unrelated to the murder," *i.e.,* if the intent to commit the rape or sodomy was not formed until after the murder. If, however, the intent to commit the rape or sodomy existed at the time of the murder, the offense is a capital offense whether the rape/sodomy happened before or after the murder. *See Williams v. State,* --- So.2d ----, ---- (Ala.Crim.App. Dec.10, 1999); *Thompson v. State,* 615 So.2d 129, 133 (Ala.Crim.App.1992).

IV.    *Claim 3B: The conviction should be reversed because the evidence was insufficient to prove that the sexual activity connected to the murder was forcible.*

In convicting Bradley, the jury necessarily had to conclude that the rape and sodomy of Rhonda involved "forcible compulsion," defined by the trial judge to mean "physical force that overcomes earnest resistance, or a threat expressed or implied that places a person in fear of immediate death or serious physical injury to oneself or to another person." Force was defined to mean "physical action or threat against another" including "confinement, serious physical injury which creates a substantial risk of death or which causes serious or protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ." Threat was defined to mean "a menace, however communicated to, among other things, cause physical harm in the future to the person threatened or to any other person."

The district court found sufficient evidence to prove forcible compulsion from the fact that "Rhonda had been strangled. She was four feet, ten and three-eighths inches tall and weighed seventy-seven pounds. She had seven wounds or bruises on her neck." Bradley insists that, because the prosecution failed to prove a temporal nexus between the rape/sodomy and the strangulation, a jury could not reasonably infer from the fact of the strangulation that Rhonda was forced to submit to oral, anal, and vaginal sex. For the same reasons that a jury reasonably could have concluded that the rape/sodomy and murder were temporally linked, we find that they could also have concluded that the sexual activity was forced upon Rhonda within the meaning of the Alabama first degree rape/sodomy statute. We note also that Alabama courts have found that "forcible compulsion" can be established "by the relationship of a child victim with the defendant charged with a sex crime involving forcible compulsion." *Rhodes v. Alabama,* 651 So.2d 1122, 1123 (Ala.Crim.App.1994) (quoting *Howell v. Alabama,* 636 So.2d 1260, 1261 (Ala.1993)). Here, Bradley was twelve-year-old Rhonda's stepfather. Based on this record, the district court did not err in concluding that sufficient evidence supported the jury's finding of forcible compulsion.

V.    *Claims 4 & 5: The death sentence should be vacated because the evidence was insufficient to support the aggravating circumstances that 1) the murder was committed during the commission of a rape and 2) the murder was "especially heinous, atrocious or cruel."*

14

In Bradley's only challenge to the imposition of the sentence of death, he argues that neither of the aggravating circumstances applied was supported by sufficient evidence and, therefore, their application was arbitrary and capricious in violation of the Eighth Amendment, as explicated by the Supreme Court in *Lewis v. Jeffers,* 497 U.S. 764, 782, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). In the sentencing phase of Bradley's trial, the jury was instructed that it could consider two aggravating factors should they find beyond a reasonable doubt that those factors applied: 1) whether Rhonda's murder was committed "while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit rape," and 2) whether Rhonda's murder was "especially heinous, atrocious or cruel" in comparison to capital murders generally. After briefly deliberating, the jury returned a death sentence. At the separate sentencing hearing held thereafter, the trial judge stated his own view that both aggravating circumstances were supported by sufficient evidence to satisfy the "beyond a reasonable doubt" standard, and that those aggravating circumstances far outweighed any mitigating circumstances in the case.

Bradley's argument with respect to the first aggravating circumstance is identical to his argument that his conviction should not stand because there was insufficient evidence to support a conclusion that the murder was committed during a rape or sodomy. For the same reasons that we rejected Bradley's argument as to his conviction, we must likewise reject his argument as it relates to the application of this aggravating circumstance.

With respect to the second aggravating circumstance, the jury was instructed that the term "heinous" means extremely wicked or shockingly evil, the term "atrocious" means outrageously wicked or violent, and the term "cruel" means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. They were also informed that the degree to which this crime is heinous, atrocious, or cruel must exceed that which exists in all capital offenses, and that in order to find the aggravating circumstance, they must find that the crime was "unnecessarily torturous to the victim." As the district court found, in order to be valid, an aggravating circumstance must "genuinely narrow the class of persons eligible

15

for the death penalty," *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), *i.e.,* must provide a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

Bradley contends that the standard "especially heinous, atrocious, or cruel" is unconstitutionally vague, and that the definition of those words, as given to the jury in this case, does not cure that vagueness. The Supreme Court has held that, on their own, the words "especially heinous, atrocious, or cruel," when used as an aggravating factor, are so vague as to run afoul of the Eighth Amendment. *See Maynard v. Cartwright,* 486 U.S. 356, 365, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Thus, in order to apply that aggravating factor in a constitutional manner, the sentencing court must give a limiting instruction to the jury. *See Lindsey v. Thigpen,* 875 F.2d 1509, 1514 (11th Cir.1989). This Court has held that a "court's consideration of the 'especially heinous, atrocious or cruel' aggravating factor must satisfy a three part test." *Id.* First, the appellate courts of the state must have narrowed the meaning of the words "by consistently limiting their application to a relatively narrow class of cases, so that their use" informs the sentencer of what it must find before it imposes the death penalty. *Id.* Bradley concedes that the Alabama courts have done that, and that the sentencing court in this case advised the jury of that narrowed construction. *See Ex parte Kyzer,* 399 So.2d 330, 333-35 (Ala.1981). Second, "the sentencing court must have made either an explicit finding that the crime was 'especially heinous, atrocious or cruel' or an explicit finding that the crime exhibited the narrowing characteristics set forth" in the state courts' construction. *Lindsey,* 875 F.2d at 1514. Third, the sentencer's conclusion as to step two "must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply." *Id.* Bradley argues that the sentencing court failed to satisfy the second and third prongs of the *Lindsey* test.

Bradley contends that the trial court failed the second prong of the test because the judge failed to recount any of the facts supporting his conclusion that Bradley's crime was "especially heinous, atrocious or cruel" within the narrowed meaning given in *Ex parte Kyzer.* Bradley relies on several cases wherein the

16

sentencing judge enumerated the facts supporting his or her finding that the underlying offense warranted application of the aggravating factor. Although none of these cases explicitly states that such an enumeration is required over and above the "explicit finding that the crime was 'especially heinous, atrocious or cruel' " that is required by *Lindsey,* Bradley urges us to find that the trial court's mere announcement that he had made such a finding without explaining which facts supported that finding, is insufficient to satisfy standards of constitutionality.

We need not decide this question, however, because on direct review the Alabama Court of Criminal Appeals did recount the facts it found to support its conclusion that the murder was "especially heinous, atrocious or cruel." That court stated:

> This Court has no difficulty in independently determining that this capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.... Here, Rhonda was not only raped but she was sexually abused and strangled to death. Rhonda was not an adult but a twelve-year-old child. Her assailant was her twenty-two-year-old stepfather. The especially heinous, atrocious, or cruel aggravating circumstance was warranted and fully justified in this case.

494 So.2d 750, 771. In order to uphold this sentence, we must find that this explanation did not "subvert the narrowing function by obscuring the boundaries of the class of cases to which" this factor should apply. *Lindsey,* 875 F.2d at 1514. In other words, we must find that the Alabama court's conclusion that this murder was "unnecessarily torturous" to Rhonda was clearly erroneous. Given the fact that a jury found that twelve-year-old Rhonda was forcibly subjected to anal, vaginal, and oral sex by her stepfather, an authority figure in her life, and then strangled, it would be difficult for us to find that the Alabama court's conclusion that those events were unnecessarily tortuous to Rhonda was clearly erroneous.

For all of the forgoing reasons, the opinion of the district court denying Bradley's petition for habeas corpus is AFFIRMED.

17