In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-3558 & 13-1103

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HECTOR ROLANDO MORALES,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 9 CR 513-2 — **Charles R. Norgle**, *Judge.*

ARGUED NOVEMBER 14, 2013 — DECIDED MARCH 25, 2014

Before WOOD, *Chief Judge*, and CUDAHY and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. More than 50 years ago, the Supreme Court announced in *Brady v. Maryland*, 373 U.S. 83 (1963), that prosecutors have a duty to turn over upon request any material evidence that is favorable to the defense. One would think that by now failures to comply with this rule would be rare. But *Brady* issues continue to arise. Often, nondisclosure comes at no price for prosecutors, because courts

find that the withheld evidence would not have created a "reasonable probability of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quotation omitted). We must leave for another day a closer examination of the incentive structure created by *Brady*'s harmless-error exception, because the case before us is another in which the *Brady* violations do not drive the result. The evidence implicating Hector Morales in a vast mail-fraud scheme was overwhelming, and we are confident that the prosecution's alleged *Brady* violation (a failure to disclose two possibly exculpatory emails until after trial) made no difference. We therefore affirm the district court's denial of Morales's motion for a new trial.

## I

Morales and his son Hector Morales, Jr. (Junior) operated a business they called Intelligent Payment Services (IPS). The only thing intelligent about it, however, was that it served the Moraleses profitably as a vehicle for defrauding small businesses. Sales agents trained by Morales would contact business owners and offer to collect on bad checks from the businesses' customers in exchange for a small commission. The agents would tell the business owners that they worked for either "American Processing Services" or "National Settlements Corporation," not IPS. The agents would then ask the business owners for certain personal information and request a voided check, ostensibly so that IPS could later wire funds obtained through its collection efforts to them.

In fact, IPS put the information to a shadier use. Once in possession of the critical data, IPS made unauthorized withdrawals from the businesses' bank accounts through various financial intermediaries. IPS would tell the intermediaries that the withdrawals covered payments on leases of credit-

card processing equipment. In reality, IPS neither collected bad checks nor leased credit-card processing equipment. In all, IPS fraudulently withdrew about $645,000 from its customers' accounts.

On July 27, 2004, a team led by Secret Service Agent Jason Kane executed a search warrant on IPS's office in Libertyville, Illinois. IPS's office suite consisted of a small reception area and two adjacent offices. Upon entering the suite, the office on the left was Junior's office, and the office on the right was Morales's. When agents knocked on IPS's front door, receptionist Carmen Donaire was the only person in the reception area, and the door to Morales's office was closed. Before the agents entered, Morales and his daughter Paulina Morales walked out of the office and moved to the reception area.

Agents found a trove of incriminating evidence on the premises. They recovered a laptop from Morales's office on which a credit-card "lease collection" form was open and partially filled out. In addition, they recovered from the same office personal financial information from ten victims and $8,000 cash. Elsewhere on the premises agents found documents in Morales's handwriting describing check collections, commissions paid to agents, and an accounting of IPS's finances with notations reflecting more than $20,000 in reversed transactions over a nine-day period. Forensic analysis of the laptop discovered in Morales's office and a laptop discovered in Junior's office revealed that both machines were used in the fraud.

Other documentary evidence also connected Morales to the scheme. Bank statements showed that during the preceding 12 months, Morales deposited funds from IPS totaling

$439,000 in his personal accounts and used an additional $55,000 in IPS funds for his personal credit card bills and car payments. (Morales even deposited IPS funds after the date of the raid.) Telephone records showed numerous calls and faxes related to the scheme from Morales's private residence and office. Finally, investigators obtained a document purporting to be a credit-card lease contract between one Walter Corea and IPS that was filled out entirely in Morales's handwriting. At trial, Corea testified that he had never heard of IPS, nor had he agreed to lease any credit-card equipment. Corea had, however, spoken with someone claiming to work for "National Settlements Corporation"; that person convinced him to sign up for a bad-check collection service that never produced a dollar in recovered funds.

Morales was indicted on nine counts of mail fraud in violation of 18 U.S.C. § 1341. At trial, the government presented dozens of witnesses, including Corea and nine other victims, forensic analysts, Donaire, and Agent Kane. Donaire testified that Morales and Junior jointly operated IPS. She noted that Morales and Junior used their respective laptops and that Morales at times directed her to call businesses in Texas and California to offer bad-check collection services. She identified Morales's handwriting on various documents. Finally, Donaire testified that she received numerous angry calls from customers complaining that IPS had made unauthorized withdrawals from their businesses' accounts. Donaire said that Morales seemed "kind of surprise[d]" when told about the calls and presented with a bank statement faxed by one customer. Soon after, Donaire testified, Morales and Junior had a heated conversation behind closed doors in one of the offices, but Donaire could not hear what they said.

Agent Kane's testimony was primarily used to lay a foundation for the introduction of documents and other evidence recovered during the search. Kane explained where in the facility various pieces of evidence were found, so that the government could then introduce the seized material as an exhibit. Kane also testified about what the search did *not* find, namely, signs of legitimate business activity in check collecting or credit-card-equipment leasing. Morales's cross-examination of Kane was not fruitful. It consisted mostly of Kane's admitting that he personally could not identify Morales's handwriting or understand Spanish.

In defense, Morales argued that the scheme was perpetrated entirely by Junior and that Morales had no knowledge of it. According to Morales, Junior betrayed him by using the business to perpetrate a fraud. Morales's counsel argued that the hundreds of thousands of IPS funds deposited in Morales's account and used to pay his bills was legitimate remuneration for Morales's work at IPS. The government opened its closing arguments by saying that Morales had been caught "red-handed" because the laptop in his office, which by all accounts was Morales's computer, showed a partially completed "lease collection" form that presumably was an instrument of the fraud. The government then rattled off the litany of other evidence in the record connecting Morales to the crimes. The jury convicted Morales on all counts, and he was sentenced to nine years in prison.

Three weeks after the trial, an assistant U.S. attorney sent Morales's lawyer two emails from Agent Kane that had not previously been disclosed. The first email, sent April 15, 2009, was a message to counsel for the government. It read:

> Just another nugget of info. When we entered
> to do the search warrant inside Hector Morales
> Seniors office the lap top [*sic*] was on a small
> desk beside his. According to the Daughter
> [Paulina Morales], she was entering in items in
> the computer. Here is a picture of what was on
> the computer at the time.

A screenshot from the laptop as it appeared when discovered in Morales's office was attached.

The second email, sent June 9, 2009, was also a message from Kane to government counsel. That email responded to a note from government counsel indicating that a grand jury subpoena for Paulina Morales was available to be picked up. The June 9 email said:

> Matt, got the message[.] I will pick it [the sub-
> poena] up and I will serve it and arrest every-
> body in the house because as you know some-
> body is going to jail and no [*sic*] more than ever
> somebody maybe a pet will be tazered!

Despite Agent Kane's bluster, he did not arrest Morales, Paulina, or any other suspect. Nor did Kane or anyone else "tazer" any person, much less pets. Rather, agents simply served the subpoena on Paulina Morales by leaving it with her father at their home.

After receiving copies of Kane's emails, Morales filed a motion for a new trial, asserting that the government's withholding of the emails until the trial was over violated his constitutional rights under *Brady*. The district court denied the motion and sentenced Morales to 108 months' imprisonment. This appeal followed.

## II

A *Brady* claim has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the government, and (3) the evidence must be material, that is, there must be "a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); see *Kyles*, 514 U.S. at 435 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The only issue on appeal relates to the third of these elements.

The parties have assumed that there is a threshold question in this case, which is whether evidence must be admissible to be considered material under *Brady*. We conclude in the end that the answer does not matter to the outcome here, because either way the result for Morales is the same. We discuss the point, however, because there is a difference of opinion among the circuits.

The Supreme Court's holding in *Brady* itself does not answer this question; there the Court said broadly that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady*, 373 U.S. at 87; see also *Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) ("Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations."). In a number of decisions, we have understood the Court to be saying that suppressed evidence must be more than material

to guilt or punishment—it must actually be admissible in order to trigger *Brady* analysis. *E.g. United States v. Dimas*, 3 F.3d 1015, 1019 (7th Cir. 1993) ("[M]ost important, the court must determine whether and to what extent [withheld] evidence … would be admissible at trial."); *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995) ("[E]vidence that would not have been admissible at trial is immaterial because it could not have affected the trial's outcome."); *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009) ("Of course … only admissible evidence can be material, for only admissible evidence could possibly lead to a different verdict."); *Jardine v. Dittman*, 658 F.3d 772, 777 (7th Cir. 2011) ("Logically, inadmissible evidence is immaterial under this rule."). The Fourth Circuit agrees with this position. See *Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996).

The First, Second, Third, Sixth, and Eleventh Circuits have not read *Brady* so narrowly. See *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013) ("[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence."); *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (*en banc*); *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000); *United States v. Phillips*, 948 F.2d 241, 249 (6th Cir. 1991); see also *United States v. Pflaumer*, 473 U.S. 922, 922 (1985) (remanding without opinion for further consideration in light of *Bagley* where appeals court stated that "[i]n order to be material, evidence suppressed must have been admissible at trial").

Courts on both sides of this question look for support to the Supreme Court's opinion in *Wood v. Bartholomew*, 516 U.S. 1 (1995). Compare *Ellsworth*, 333 F.3d at 5 (*Wood* "implicitly assumes" that inadmissible evidence could be "so promising

a lead to strong exculpatory evidence that there could be no justification for withholding it"), with *Hoke*, 92 F.3d at 1356 n.3 (citing *Wood* for the proposition that inadmissible evidence is, "as a matter of law, 'immaterial'"). In *Wood*, the Court considered a case in which the undisclosed evidence was unquestionably "inadmissible under state law, even for impeachment purposes." 516 U.S. at 6. At the outset, the Court acknowledged that the evidence "could have had no *direct* effect on the outcome of the trial" because it was "not 'evidence' at all." *Id*. (emphasis added). Nevertheless, the Court did not end its opinion with that observation, as it would have done if inadmissibility were the end of the matter.

Instead, the Court proceeded to analyze whether the withheld information "might have led [defendant's] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized." *Id*. It concluded that the answer to this question was no. In so doing, it noted that the court of appeals had failed to specify what evidence might have been found, if the suppressed materials had been turned over. *Id.* The record provided strong support for a finding of immateriality: defendant's counsel "acknowledge[d] that disclosure would not have affected the scope of his cross-examination" of the implicated witness. *Id*. at 7–8. Under those circumstances, the Court concluded, "it [was] not 'reasonably likely' that disclosure … would have resulted in a different outcome at trial." *Id.* at 8. We find the Court's methodology in *Wood* to be more consistent with the majority view in the courts of appeals than with a rule that restricts *Brady* to formally admissible evidence.

The fact that evidence that can be used only for impeachment is subject to the *Brady* rule also supports the majority position. See *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *Bagley*, 473 U.S. at 676. Although extrinsic evidence is not admissible to prove specific instances of a witness's conduct, see FED. R. EVID. 608(b), withholding such evidence from the defendant still falls within the ambit of *Brady* if inquiring about the witness's conduct during cross-examination "may [have made] the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676; see, *e.g.*, *Salem*, 578 F.3d at 689 (explaining that witness's alleged involvement in first-degree murder may have been material impeachment evidence under *Brady*). It is hard to find a principled basis for distinguishing inadmissible impeachment evidence and other inadmissible evidence that, if disclosed, would lead to the discovery of evidence reasonably likely to affect a trial's outcome.

If, despite all this, we were to adhere to our existing rule on the materiality of inadmissible evidence for *Brady* purposes, Morales's case would be over. If we thought that Morales might prevail under the majority rule, we would entertain the idea of reconsidering our approach. As we now explain, however, we conclude that Morales would lose no matter what circuit he was in, and so this is not the occasion for any such reconsideration.

As we already have noted, evidence is material for *Brady* purposes only if there is a "reasonable probability" that its disclosure to the defense would have changed the result of the trial. *Kyles*, 514 U.S. at 433–34 (quoting *Bagley*, 473 U.S. at 682). The defendant need not prove that disclosure would more likely than not have resulted in acquittal, nor that the

evidence would have been insufficient to convict if timely disclosure had been made. *Id.* at 434–35. Rather, "favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Cone*, 556 U.S. at 470 (quotation omitted). Because "the effect that a particular piece of evidence is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial," we review the district court's denial of a new-trial motion based on a finding of lack of materiality only for an abuse of discretion. *Silva*, 71 F.3d at 670.

Morales argues that Kane's April 15 email was material under *Brady* because (a) the email contradicted the government's "trial theme" that Morales was caught "red-handed," and (b) the email was useful impeachment evidence because of its "inconsisten[cy] with Agent Kane's trial testimony that [Paulina Morales] was within sight of the front entrance of IPS" when agents arrived for the raid. We consider these points in turn.

Although the April 15 email contains Paulina Morales's hearsay statement that she, rather than her father, was entering items in the computer, we see no likelihood that her statement would have affected the outcome of the trial. To begin with, Morales exaggerates when he says that the government's "trial theme" was that it caught Morales red-handed. The government's position was that Morales was intimately involved in the fraud at every step, and it had ample evidence to back this up. It showed that Morales trained and recruited sales agents, falsified documents, kept the books, and collected the profits from the fraud. That Mo-

rales may or may not have been "caught red-handed" during the office raid was not crucial to the government's case. Even if Morales did not enter information in his computer immediately before the agents' arrival, that would do almost nothing to advance his argument that he had no involvement in the fraud, given the wealth of other evidence. *Cf. Strickler*, 527 U.S. at 293 (rejecting *Brady* claim where "there was considerable forensic and other physical evidence linking petitioner to the crime").

In using the expression "caught red-handed" during closing arguments, the government's attorney was urging the jury to draw the inference that Morales was caught in the act of perpetuating the fraud because the computer that he regularly used and that was in the office from which he emerged showed a fraudulent lease form in progress. Even if Paulina Morales's statement that she was "entering in items in the computer" when agents arrived had been revealed to the jury, the government could just as easily have urged the jury to draw the inference that Morales was caught red-handed because his daughter was in the midst of helping him to carry out his fraudulent scheme. Whether, or the extent to which, Paulina was involved in the scheme does not mitigate Morales's own substantial role.

Moreover, Paulina's hearsay statement from the April 15 email contains no information that Morales should not already have known. See *United States v. Mahalick*, 498 F.3d 475, 478–79 (7th Cir. 2007) ("*Brady* requires disclosure only of exculpatory material known to the government but not to the defendant.") (quoting *United States v. Dawson*, 425 F.3d 389, 393 (7th Cir. 2005)). Morales contends that he could not have known before the disclosure of the April 15 email what

his daughter was entering into his computer and that, had he known, he would have called her to testify. But that is nonsense. Morales knew from the moment the agents conducted their raid that Paulina was with him in his office; all he had to do was ask her what she was doing. By the time of trial, Morales knew exactly what the agents had found on the laptop in his office. Nothing in the contested emails would have helped him decide whether to call Paulina to the stand. The notion that Morales would have called Paulina as a witness if he had the April 15 email available to impeach her, and that her testimony would have affected the trial, is too speculative to be availing. See *Wood*, 516 U.S. at 6 (rejecting finding of *Brady* materiality where "judgment is based on mere speculation").

Nor could Morales have used the April 15 email to impeach Agent Kane's testimony. See *Salem*, 578 F.3d at 688 ("[O]rdinarily, newly discovered impeachment evidence will not warrant a new trial under *Brady*."). Indeed, we see nothing in the April 15 email that contradicts Kane's testimony. Kane's account of Paulina Morales's location was clear and consistent with the email. Using a blueprint of the offices, Kane pinpointed every person's location. Donaire corroborated Kane's account by testifying that Morales and Paulina were in Morales's office when the agents arrived, but came out to the reception area by the time they entered. At most, the April 15 email reveals a slight discrepancy between these accounts and Paulina's. But that discrepancy is resolved by reading the word "entered" to mean "arrived." When agents "arrived" to execute the search warrant, Paulina was in the office. By the time agents walked into the premises, Paulina was in the reception area. None of this matters, however. Whether Paulina was or was not in the reception area when

officers entered to execute the search warrant has no bearing on Morales's guilt or innocence. Because the April 15 email does not undermine confidence in the verdict, it was immaterial for *Brady* purposes.

Morales's argument about the June 9 email fares no better. He contends that the June 9 email was material because it could have been used to impeach Kane's testimony on grounds of bias. Once again, we conclude that the email could have had no discernible effect on the trial.

This argument founders because it is hard to see how the June 9 email demonstrates any bias. Kane's little show of bravado in an internal email to a colleague had no real-world consequence, as he neither arrested nor tazed anyone (or anyone's pet). Because the impeachment value was minimal at best, Morales has not shown that disclosure of the June 9 email would have created a reasonable probability of a different outcome. See *United States v. Agurs*, 427 U.S. 97, 109–10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense … does not establish 'materiality' in the constitutional sense.").

Finally, we see no cumulative effect from the belated disclosure of the two emails. The government's case did not rest entirely, or even principally, on Agent Kane's testimony. The government could have called a different agent to testify about the office layout and the location of the items that were seized had Kane been discredited. Indeed, it did: several witnesses, as well as documentary and forensic evidence, corroborated Kane's testimony.

In light of the strength of the evidence against Morales, the emails do not undermine our confidence in the verdict.

Under any test that might apply, we conclude that the district court did not err when it denied Morales's motion for a new trial.

AFFIRMED.