In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-4258 & 05-4329

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER PALIVOS and LOUIS MARIN,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 1065—**Joan Humphrey Lefkow**, *Judge.*

---

ARGUED JANUARY 17, 2007—DECIDED APRIL 10, 2007

---

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Peter Palivos, an attorney, and
Louis Marin, a loan broker, were indicted, along with
a number of other defendants, for their involvement in
a shady 1996 real estate deal. Both were convicted—
Marin of assisting in the preparation and presentation
of a false tax return and Palivos of conspiracy to ob-
struct justice—though he was acquitted of obstruction of
justice. They appeal their convictions.

The deal involved a complex loan fraud scheme in
which the seller of a problem-plagued restaurant, the
Waterfalls, in Antioch, Illinois, secretly fronted money

to the buyer to finance the sale. The seller, also a defendant in this case, was JACPG, Inc., a private corporation with a small number of shareholders, including Palivos and his brother George Palivos,[1] also a defendant. The buyer was Peter Bouzanis,[2] who had no financial resources, only limited experience in the restaurant business, was a felon, and had a lackluster credit history. Other than that, he seemed perfect.

The mortgage to finance the purchase was obtained from The Money Store and was partially guaranteed by the United States Small Business Administration (SBA). The loan itself was for approximately $1.25 million. Because of misrepresentations made during the loan application process, The Money Store and the SBA were not aware that 100 percent of the funds for the closing came from the seller.

Making the deal go through required a bit of imagination. To qualify for the loan, Bouzanis presented false income tax returns to The Money Store. He also completed a document that allowed the lender to obtain his federal income tax forms. Because the 1994 tax return Bouzanis filed with the Internal Revenue Service showed an adjusted gross income of $8,005, hardly enough to convince any lender to give him a big loan, Marin instructed his accountant to prepare an amended income tax return for Bouzanis showing an income of $52,000.

---

[1]  When we refer to "Palivos" we mean Peter. When necessary, we will use full names to distinguish between Peter and George.

[2]  George Palivos and Bouzanis are fugitives believed to be living in Greece.

Obviously, Bouzanis had no money for a down payment so, as we said, the sellers provided it. Bouzanis was required to come to the closing with over $350,000 for a down payment and evidence of $45,000 in working capital. To come up with the money, Palivos's brother-in-law Dimitrios Bousis went to a bank where he was a long-time customer and pledged his own accounts to guarantee a $354,000, 5-day, interest-free bank loan to Bouzanis. The bank cut a cashier's check indicating that it represented the proceeds from a loan. Because the sellers knew the down payment could not be encumbered, they asked the bank to void that check and issue a replacement with no reference to a loan. Bousis and Palivos also helped Bouzanis convince the lender he had $45,000 in working capital. Palivos purchased a $45,000 cashier's check which Bousis deposited into his bank account. Bousis then wrote a $45,000 personal check to Bouzanis, who deposited it in an account that he had opened that same day for the new restaurant business.

To explain why so much money changed hands around the time of the closing, the parties fabricated a purchase price dispute and manufactured a paper trail. The paper trail consisted of bogus letters between the parties discussing the poor condition of the restaurant. The dispute was then "settled" by a payment after the closing of $392,500 to Bouzanis. Bouzanis then wrote a check to Palivos for $25,000 in "Partial Repayment of Loan," as stated on the check memo. The proceeds remaining from the sale were distributed to JACPG shareholders. Palivos received $75,000. That sum, along with the $25,000 from Bouzanis, amounted to a $100,000 gain for Palivos from the fraudulent transfer.

After Bouzanis purchased the restaurant he immediately defaulted on the loan. That, in turn, led to a criminal investigation by the SBA Office of Inspector General and the Federal Bureau of Investigation. The government served grand jury document subpoenas on the subjects of the investigation, including Nicholas Black, a real estate lawyer who represented JACPG. Black is central to Palivos's appeal.

After he was served with the subpoena in 2000, Black talked with George Palivos, who reminded Black of the so-called purchase price dispute. George Palivos asked Black if he had kept notes from the transaction. Black said that if notes were not in his file, "they would be." Black testified at trial that what he meant by that statement was that he would make up notes.

A few days later, George Palivos showed Black other letters that had been made up at the time of the sale to document the phony purchase price dispute. Peter Palivos joined the discussion and told Black that it would be "nice" if Black found similar notes in his file. After Black located his file from the closing, he met again with Peter and George Palivos. At that time, there were no notes in Black's file about the dispute or about the check from Bouzanis to Peter Palivos. Again Peter Palivos told Black that it would be "nice" and "helpful" if there were notes, which would appear as if they were written at the time of the "dispute" in 1996. Black said "they would be in the file." It was important that the notes be "found" in Black's file because he had prepared the paperwork for the deal.

Later, though, Black seemed to get cold feet and expressed concern about fabricating the notes. Saying that sometimes doctors involved in malpractice litigation manufactured notes, Peter Palivos told Black to find

old paper and an old pen to write the notes and suggested that he rub the paper against something so no one could tell when the notes were written. Black did as was suggested and manufactured notes: one about the purchase price dispute and one about money Bouzanis refunded to Palivos after the closing. Black personally delivered the notes, as required by the subpoena, to a government agent. He also gave Palivos copies of the letters. Palivos thanked Black and said he appreciated what he had done.

But the government was not fooled by the notes. Almost immediately, agents went to Black's office to question him. They also submitted the notes to the IRS Crime Laboratory for analysis. The results of a laboratory indentation analysis revealed what was written on the legal pad paper directly above the notes—that is, paper that presumably would have been used before the notes were created. The indentations showed a reference to July 1997, confirming the government's doubts about Black's statement that he wrote the notes in April 1996.

The government arranged a meeting with Black's attorney. In the meeting, the attorney was told that the government had forensic evidence showing that the notes were written long after the closing. Black was not present.

Soon after that meeting Black changed lawyers, and his new attorney informed the government that Black wanted to cooperate with the investigation. During several meetings with the government, Black explained what he knew about the fraud and the subsequent obstruction of justice. He also testified before the grand jury. Black was charged for his involvement

with the loan fraud and the subsequent obstruction of justice. He ultimately pled guilty.

We turn our attention back to Palivos. In the district court Palivos filed at least six post-trial motions for relief from his conviction. All were denied. He now raises several, somewhat related, issues on appeal.

First, he contends that he was convicted based only on Black's testimony, which he claims was false and was given because Black was manipulated into framing him. We review the denial of his request for a new trial for an abuse of discretion, *United States v. Van Eyl*, 468 F.3d 428 (7th Cir. 2006), and reject it.

Palivos says that the government misled Black, causing him to plead guilty and testify falsely. The alleged manipulation involves the notes in Black's file regarding the purchase price dispute. As we said, at an interview with Black's lawyer, the government said that there was forensic evidence showing that the notes were written well after the closing. Palivos argues that the government said the evidence was ink analysis, which, in fact, did not exist. The government denies ever saying there was ink analysis; rather, the evidence was the indentation analysis showing a 1997 date had been written on the sheet of paper above the one on which the notes were written, making it unlikely that the notes were written in 1996—at the time the deal was going down.

There are problems with Palivos's argument. Black's attorney at the time talked with the government, but Black himself was not involved in the conversation. There is no evidence that the government misled Black's attorney into thinking there was ink analysis, rather than simply indentation analysis. Furthermore, even

if the government engaged in artifice, Palivos would still not have a claim: "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *United States v. Swiatek*, 819 F.2d 721, 725 (7th Cir. 1987), quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932).

More importantly, a new trial is ordered, on the basis of the use of perjured testimony, only if a defendant establishes that (1) there was perjured testimony, (2) of which the government knew or should have known, and (3) that testimony could have affected the outcome of the trial. *United States v. Burke*, 425 F.3d 400 (7th Cir. 2005). Palivos has not shown that Black's testimony is, in fact, false. Black has always maintained that he testified truthfully at trial. The jury was entitled to believe him.

There was other evidence as well. There was testimony from Dean Kalamantianos, who practiced law with Black and attended the real estate closing. Kalamantianos testified that Black told him about the bogus notes that he prepared at the request of Palivos. And although there was no ink analysis, there was forensic evidence in the form of indentation evidence. Palivos has not shown that the district court abused its discretion by denying his request for a new trial based on this claim.

Next, we consider Palivos's argument that he should have a new trial, apparently because 5 days after trial he found "newly discovered evidence," which he says also reveals a government violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and his confrontation and due process rights. We say "apparently" because the argument, presented in an almost stream-of-consciousness manner, is rather difficult to pin down.

To obtain a new trial under Federal Rule of Criminal Procedure 33, Palivos must show that the new evidence (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material in the sense that it bore directly on guilt or innocence and was simply impeaching or cumulative; and (4) if presented at a new trial would probably result in acquittal. *United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003). For a *Brady* violation to exist, entitling a defendant to a new trial, he must establish (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it is material to an issue at trial. Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also United States v. Irorere*, 228 F.3d 816 (7th Cir. 2000). Impeachment evidence falls within the *Brady* rule. *Giglio v. United States*, 405 U.S. 150 (1972). We review for abuse of discretion the denial of a motion for new trial based upon newly discovered evidence claimed to violate *Brady*. *See United States v. Asher*, 178 F.3d 486 (7th Cir. 1999); *United States v. Silva*, 71 F.3d 667 (7th Cir. 1995).

Palivos contends that an unsigned letter, dated February 13, 2003, apparently written by attorney Elliot Samuels to Black, is *Brady* material. It may be that he also contends two or three other letters, including a September 19, 2002, letter from Samuels to Aotirios Bregiannos in Athens, Greece, also are *Brady* material.

The February 13 letter states in part:

Regarding these documents, it was represented by certain government agents that scientific, forensic

tests had conclusively established that the documents were recently prepared and added to your file and, therefore, were not genuine. We now know that the government's motive for this deception (as it later proved to be) was to induce you to cooperate against certain individuals who had played various roles in the Waterfalls deal. . . . Fortunately for us, some of the indicted defendants entered not guilty pleas, which required the government to reveal and disclose the results of all scientific reports, otherwise these documents never would have seen the light of day. Contrary to the representations made, the forensic tests performed on the documents clearly do not substantiate and, in fact, contradict the assertions made by the government which induced you to cooperate.

The September 19 letter to Bregiannos states that "certain misrepresentations have been made to us by federal agents."

Palivos's theory is that the letters show that the government misrepresented the forensic evidence regarding the notes in Black's file. He claims Black would not have entered a guilty plea except for those misrepresentations. And Palivos contends that after finding out he had been duped, Black considered withdrawing his guilty plea based on prosecutorial misconduct. Ultimately, realizing he might face more serious consequences by withdrawing his plea, Black changed his mind. The upshot of Palivos's argument is that the Samuels letters show Black was misled, and if he had not been misled, he would not have ended up testifying against Palivos.

That is a leap. And the argument lacks factual support. We are not told the basis for Samuels' belief that

the government misrepresented the forensic evidence. In fact, Samuels stated in an affidavit that his letter was "bogus." Additionally, we find it curious that even if what Samuels' letter says is true, it does not show any real motive for Black to lie. Under Palivos's view of the facts, Black was the victim. Finally, there is no reasonable probability that a letter, termed bogus by the writer, which claims the government duped its own witness, would have changed the outcome of the proceedings. We also find that it was not an abuse of discretion for the district judge to decline to hold an evidentiary hearing on these remarkable claims.

Palivos also claims that he was denied a fair trial because the prosecutors misrepresented the evidence, violated the trial court's order, and made improper arguments to the jury. We review for an abuse of discretion the denial of a motion for a new trial based on prosecutorial misconduct. *United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000). We must determine whether the prosecutor's remarks "so infected the trial that he was denied due process." *United States v. Emenogha*, 1 F.3d 473, 481 (7th Cir. 1993); *see also United States v. Xiong*, 262 F.3d 672 (7th Cir. 2001).

Once more, we return to Black's testimony. Palivos says that an assistant United States attorney, William Hogan, stated to the court that the defense was not in for any surprises at trial. But when Black took the stand, he told the jury a story about two pads of paper and two pens (with which he wrote the backdated notes for his file) when, prior to that time, he had said there was one pen and a pad of paper. We are not overly impressed about the surprise value of testimony regarding two pads of paper, rather than one. A surprise would be if Black previously maintained that he did not

write the notes and then suddenly testified that he did. Plus, the discrepancy is gift-wrapped cross-examination material.

Palivos also contends that AUSA Hogan failed to give the defense notice that the testimony of JACPG's accountant, Jerrold Weinstein, would be different at trial from that given before the grand jury. We do not quite follow the argument. Prior to Weinstein's trial testimony, Hogan advised the court that Weinstein would testify that Palivos was a shareholder in JACPG, whereas in front of the grand jury he said he had no knowledge whether Palivos was a shareholder in JACPG. That would seem to provide notice of the change in the testimony.

Palivos also argued that any testimony from Weinstein about Palivos's connection with JACPG would be hearsay because the basis of his knowledge was a conversation in which John or Chris Katris (two of the JACPG shareholders) told him that the "P" in JACPG stood for Peter. A lengthy conference was held outside the presence of the jury as to whether this testimony was inadmissible hearsay. The court ruled for the defense as to the "P" issue but went on to say:

> I believe that in order for this witness to give appropriate evidence, he works with the principal of the corporation. And so there as long as the question is focused with his work, the testimony—there is going to be some hearsay admissible.

The judge likened Weinstein's probable testimony with that of an expert witness, which prompted the defense to jump on another argument: that they had not received proper notice of expert testimony. The judge then arrived at the conclusion that Weinstein was a lay

witness with special expertise, and in order for him to apply his expertise in his job, he had to ask questions of the principals as to how corporation money should be distributed. With that, testimony recommenced.

During his testimony, Weinstein was not asked about the "P" in JACPG but at some point was asked how the money from the sale was distributed. He said, two shareholders each received $150,000 and two (George and Peter Palivos) each received $75,000. No simultaneous objection was lodged to the question which resulted in these answers, but after direct examination, defense counsel contended that it was hearsay and should be stricken. After some wrangling, the judge disagreed.

Palivos argues that all of this amounted to prosecutorial misconduct; that is, that in questioning Weinstein, AUSA Hogan simply disregarded the court's ruling. That argument cannot be sustained. The court's ruling as to what was excluded was very specific and was complied with. But there was some confusion as to what would be allowed and why. It cannot be said that the questions which were asked were in clear violation of the judge's ruling. And no simultaneous objection was made to the testimony. And even with all that said, it is rather hard to see why an accountant cannot testify about the people to whom funds were distributed and why.

Other claimed misconduct involves AUSA Hogan's reference to the defense case as weak and their arguments misleading. It is doubtful that any remarks called to our attention were improper, but certainly if they were, our review of the record shows that they did not infect the trial with unfairness.

Palivos's final claim is that the judge failed to instruct the jury on the elements of the offense of conspiracy to obstruct justice. This claim fails as well. When we review jury instructions for alleged errors of law, we reverse only if the instructions, "viewed as a whole, misguide the jury to the litigant's prejudice." *United States v. Souffront*, 338 F.3d 809, 834 (7th Cir. 2003). We note that as long as "'the instructions treat the issues fairly and accurately,' they will not be disturbed on appeal." *Souffront*, 338 F.3d at 834, quoting *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir. 1985). Furthermore, Palivos did not object to the instructions in the trial court, nor did he propose alternate instructions.

The instruction was as follows:

> A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. Peter Palivos is charged with conspiracy in Count 6.

> To sustain the charge of conspiracy, the government must prove the following: First, that the conspiracy as charged existed and, second, that each defendant knowingly became a member of the charged conspiracy with an intention to further the conspiracy. And, third, that an overt act was committed by at least one conspirator in furtherance of the charged conspiracy.

> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty of the charged conspiracy. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable

doubt, then you should find the defendant not guilty of the charge of conspiracy.

A conspiracy may be established even if its purpose was not accomplished. It is not necessary that all the overt acts charged in the indictment be proved and the overt act proved may itself be a lawful act. To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which its purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.

To sustain the charge of obstruction of justice the government must prove the following propositions: First, that defendant Peter Palivos influenced, obstructed, impeded or endeavored to influence, obstruct or impede the due administration of justice. Second, that defendant Peter Palivos acted knowingly. And, third, that defendant Peter Palivos' acts were done corruptly; that is, by producing and causing the production of materially false and misleading documents in response to the grand jury subpoena served upon Nicholas Black with the purpose of wrongfully impeding the due administration of justice.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty. The word endeavor

described any effort or act to influence, obstruct or impede the due administration of justice. The endeavor need not be successful but it must have at least a reasonable tendency to influence, obstruct or impede the due administration of justice.

While the relationship between the conspiracy and the obstruction of justice could have been stated a bit more clearly, we find that, viewed as a whole, the instructions fairly and accurately informed the jury of the elements of the crime.

We turn next to Mr. Marin. His basic contention is not that he is blameless, but rather that he was charged with the wrong crime. We agree.

Marin was charged with a violation of 26 U.S.C. § 7206(2). That section requires that a person willfully aid or assist in "the preparation or presentation under . . . the internal revenue laws, of a return . . . which is fraudulent . . . as to any material matter . . . ." There seems to be no dispute that to be a violation of this section the return must have been filed with the Internal Revenue Service. The fifth superseding Indictment in this case says that Marin aided in the preparation and presentation to the IRS an

> individual income tax return (Form 1040) on behalf of Peter Bouzanis for the calendar year 1994, which return defendant LOUIS MARIN did not believe was true and correct as to every material matter, in that at line 12 of the Form 1040, it falsely stated that Peter Bouzanis earned business income of $52,000, when in fact, as defendant LOUIS MARIN well knew, Peter Bouzanis did not earn such business income[.]

The problem is that the return for which there is some evidence of fraud is not the return which was filed with the IRS and cited in the indictment.

For the 1994 tax year, Bouzanis filed (on February 16, 1995) an individual income tax form 1040, showing wages, etc. of $11,005, as shown on a W-2 form, and adjusted gross income of $8,005. That paltry income, as we previously observed, would hardly inspire any lender to loan him $1.25 million. So Marin enters the picture. Marin said in his statement to Thomas Heinzer, a Special Agent with the SBA, Office of Inspector General, that he requested his friend, an accountant, to prepare a "bogus" tax return for Bouzanis and that the accountant insisted that the form be filed with the IRS. The form, Marin continued, was used "to reflect a more favorable income history" for Bouzanis. The point of the whole enterprise, of course, was to obtain the loan.

So another 1040 was filed with the IRS. It showed business income (line 12) of $52,000. Attached to this form was a Schedule C—Profit or Loss From Business for sole proprietorships, reflecting the $52,000. This is the return cited in the indictment. But there is little, if any, evidence in the record that this return was fraudulent.

Also, it is not the return which was given to The Money Tree. That was yet another form—a Form 1040A individual tax return. It showed wages, salaries, etc. of $52,000. There is, of course, no W-2 attached to the 1040A because there was no such salary. The salary was, in Marin's word, "bogus." This is the return the lenders received, but it is undisputed that this return was not filed with the IRS.

Special Agent Heinzer testified that the only return he was "concerned about" was the one turned over to

The Money Store—the 1040A. Marin's statement establishes that the 1040A was false and that it was used in an attempt to obtain a loan. But, to repeat, this return was not filed with the IRS.

As to the form which was filed—the 1040 with the Schedule C attached—the evidence falls short of showing beyond a reasonable doubt that it was false. Probably it was, but that is not good enough. In testimony before the grand jury which was read during the trial, Heinzer acknowledged that no one checked to see whether Bouzanis and Company had made $52,000. It is true that at trial he also testified that there is no Bouzanis and Company and that a subpoena was sent to the Illinois Secretary of State for records regarding that company or corporation and none were found. Cross-examination showed, however, that Heinzer did not know whether Bouzanis was operating an unincorporated enterprise. Or, we might add, an illegal enterprise.

In short, we conclude that beyond a reasonable doubt the 1040A was patently false and it was used to defraud The Money Store and the SBA. Also, beyond a reasonable doubt, that form was not filed with the IRS. The 1040 with the Schedule C was filed, but it cannot be said that it was false beyond a reasonable doubt. Marin aided in the commission of the fraud in this case, but he did not violate § 7206(2). Accordingly, his conviction must be vacated.

The judgment of conviction as to Peter Palivos is AFFIRMED; the judgment of conviction against Louis Marin is VACATED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*