In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2204

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANAS SALEM,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 CR 181—**Lynn Adelman**, *Judge.*

ARGUED MAY 13, 2011—DECIDED JUNE 21, 2011

Before CUDAHY, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury convicted Anas Salem of using a gun to intimidate a witness. 18 U.S.C. § 1512; *id.* § 924(c). On the eve of Salem's sentencing hearing, the government produced statements placing that witness—who was also the government's star witness against Salem—at the scene of a murder for which he was never charged. Salem moved for a new trial, arguing that this belatedly produced evidence would

have shown that the witness had a motive to tailor his testimony in the government's favor and, therefore, that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to disclose it before trial. The district court disagreed and denied Salem's motion. Salem appealed, and we vacated the district court's order after concluding that the record was insufficiently developed to permit the finding that the government's belated disclosure of the evidence did not run afoul of *Brady* and *Giglio*. *See United States v. Salem*, 578 F.3d 682, 690 (7th Cir. 2009). We instructed the district court to hold an evidentiary hearing and remanded the case so it could do so. *See id.*

The district court followed our directives to the letter, developing the record, holding a hearing, and making findings concerning the belatedly disclosed evidence. After taking these steps, it reached the same conclusion it did the first time: there was no reasonable probability that the outcome in Salem's case would have been different if the jury had been apprised of the murder evidence during trial. Salem appeals once more. This time we affirm.

**I.**

Carlos Lopez, a member of the Milwaukee Latin Kings street gang, began cooperating with the government in the summer of 2005. His cooperation helped bring about a thirty-eight count indictment against forty-nine Latin Kings, including Salem's brother and Lopez himself. The September 27, 2005, indictment charged Lopez with a

variety of drug, gun, and RICO crimes, but he was out on bond when Salem allegedly threatened and beat him on November 1, 2005.

According to Lopez's testimony at Salem's trial, he was out with a friend, Shane Bach, when fellow Latin Kings Salem and Marcus Colin approached his car, accused him of being a snitch, and threatened to shoot him. Lopez maintained that he was not a snitch and claimed he had "paperwork" to prove it. Salem demanded to see the paperwork, so Lopez drove Salem, Colin, and Bach to his house. During the car ride, Lopez testified, he heard Salem ask Colin if he had "one in the chamber," which Lopez took to mean a bullet in a gun. When the quartet arrived at Lopez's house, Salem warned Lopez that he would shoot Lopez's mother if Lopez did anything stupid.

Salem and Colin entered the house with Lopez, who staged a search for the nonexistent paperwork. Salem stayed "right behind" Lopez the whole time, following him as he rifled through papers on his mother's desk. Lopez's mother appeared, and Lopez told her, while winking, that he was looking for his paperwork. He continued the charade for a few minutes before asking Salem if he could go upstairs to look in his bedroom. Salem responded by telling Lopez that if he did not exit the house in five seconds, Salem would shoot Lopez's mother. Lopez hurriedly left the house with Salem and Colin, ignoring his mother's warning that his pretrial release curfew was approaching.

When Colin, Salem, and Lopez got to the car, they found that Bach was gone. Salem instructed Colin to

drive to Bach's house to look for him. At some point during the drive, Salem took Lopez's cell phone. Colin parked the car a few blocks from Bach's house and he, Lopez, and Salem approached the house on foot. Lopez testified that when they reached a gangway leading to the house, Salem ordered him to turn out his pockets and open the gate on the gangway. Lopez handed Salem the $80 he had on him but refused to open the gate. Salem then pulled a revolver out of the front pocket of his hooded sweatshirt. Lopez grabbed for the gun, and a struggle ensued. Colin grabbed Salem and punched Lopez in the head. All three men fell to the ground; Salem pointed the gun at Lopez and threatened to kill him. Lopez pleaded with Salem and eventually convinced him not to shoot. Instead, Salem, Colin, and Lopez all returned to the car and drove around some more, looking for rival gang members on whom to take out their frustrations. Unable to find any, they parted ways. Before leaving, Salem told Lopez that he would return Lopez's money and phone when Lopez provided the paperwork demonstrating that he was not a snitch. Salem also reminded Lopez that snitches get killed.

Salem's attorney took great pains to impeach Lopez during cross-examination. She pointed out inconsistencies between the details of his trial testimony and testimony he'd previously given. She emphasized the stiff penalties Lopez faced in connection with the Latin Kings indictment—a maximum of life imprisonment and various mandatory minima—and grilled him about his motives for testifying against Salem. Lopez expressly denied familiarity with the concept of substantial assis-

tance, with U.S.S.G. § 5K1.1, and even with "the benefits of becoming a cooperating witness for the Government." Undeterred, Salem's attorney used leading questions to make clear to the jury that the government "and the Government only, [could] make a motion so that . . . mandatory minimums [would] not apply" to Lopez if he "provide[d] testimony to help convict other people." She explored Lopez's invocation of his status as a cooperating federal witness when he was arrested by state authorities and got him to admit that his bond was not revoked as a result of that incident. She also got Lopez to admit that he had permitted Colin to take the fall for a gun the police found at Lopez's house in February 2005 and that a detective mentioned Salem's name to Lopez a few months before Lopez reported the alleged attack.

The government attempted to rehabilitate Lopez on redirect by asking him about his attention deficit disorder, limited education, and noble motives for cooperating and testifying. The government also presented testimony from other witnesses to round out its case. Bach testified that he heard Salem ask Lopez why he was snitching, and that he heard either Salem or Colin—he wasn't sure which—ask whether there was "one in the chamber." Lopez's mother corroborated Lopez's testimony about his "search" for paperwork at her house. She testified that Lopez looked worried and "look[ed] at [her] weird" while shuffling through papers on her desk. She also testified that Salem stayed right behind Lopez the entire time they were in her house, and that she heard Salem say "you have five" right before

he, Colin, and Lopez left the house. When Lopez returned home, she continued, she saw injuries on his neck and face. The government showed photographs of those injuries to the jury. The government also called Colin, but he refused to testify.

Salem called only one witness, FBI Agent Douglas Porrini, who had previously interviewed both Colin and Lopez. He testified, as a defense witness, that Colin told him that Salem orchestrated the abduction of Lopez and that Salem was the only one who had a gun that day. Porrini also testified that Lopez had changed his story during one of his interviews.

During closing argument, the government asserted that Lopez would receive no "credit" for testifying because he was appearing as a victim, not a cooperating witness. It also argued that the inconsistencies in Lopez's testimony were minor and emphasized that Lopez was always consistent about the crucial facts. When it was Salem's turn, his attorney resumed her efforts to discredit Lopez. She highlighted the inconsistencies in his story and asserted that it made no sense for him to bring two threatening men to look for nonexistent paperwork in his home, where they could harm his family. She reminded the jury of the lengthy sentences Lopez could face if he were convicted on the charges pending against him, and observed that it is "common knowledge, that cooperators get a benefit from the Government." She also reiterated that because the charges were still pending, "any benefit that he's going to receive from the Government is yet to be

defined." Salem's attorney also offered the jury a reason why Lopez might have fabricated the story he told on the stand: he was late for his curfew and had to come up with a good excuse to avoid revocation of his bond.

The jury convicted Salem after deliberating for about an hour.

**II.**

On the day of Salem's sentencing, the government disclosed to him a plea agreement it had entered with one of his co-defendants, Benny Martinez. Martinez had pleaded guilty to racketeering, with predicate acts including the December 9, 2004, murder of rival gang member Adan Sotelo. The agreement contained statements about the Sotelo homicide attributed to both Martinez and Lopez, the victim and star witness in Salem's case. According to the plea agreement, Lopez told police that he and Martinez ambushed Sotelo in an alley because they wanted to prevent him from retaliating against the Latin Kings for an earlier shooting. Lopez further reported that Martinez shot Sotelo several times, killing him, before fleeing the scene and hiding with Lopez.

After his sentencing hearing, Salem requested and received from the government police reports and preliminary witness statements relating to the Sotelo murder. These documents did not contain the statements that the Martinez plea agreement attributed to Lopez.

Salem moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. He argued that he should have the opportunity to use the evidence of Lopez's involvement in the Sotelo homicide to impeach Lopez. The district court found that even if Salem were afforded that opportunity, the result of the trial would be the same. It therefore denied Salem's motion. Salem appealed, and we expressed concern that the district court ruled on the motion before requiring the government to disclose the statement from Lopez that had been reported in Martinez's plea agreement. We vacated the order denying Salem's motion and remanded so the district court could reconsider the motion on a fully developed record.

On remand, the district court ordered the government to produce all evidence regarding Lopez's role in the Sotelo homicide. The government turned over debriefing statements from Martinez, Lopez, and another Latin King, Michael Carroll. According to Lopez's statement, which the government had since September 2, 2005, he was in a car with Martinez, Carlos Avila, and driver Carroll on December 9, 2004, when they saw some rival gang members in an alley. The rivals gave chase, but the Latin Kings were able to escape to a nearby house where some fellow Latin Kings were doing roofing work. They told the roofers about their encounter with the rival gang members, and one of the roofers handed Martinez a black 9mm pistol, referred to as "China." Lopez then got back in the car with Avila, Carroll, and the now-armed Martinez and returned to the rivals' neighborhood. Avila and Carroll remained in

the car while Lopez and Martinez took "China" to the alley where they had spotted the rivals. Martinez fired eight or nine shots into the alley, hitting and killing Sotelo in the process. He and Lopez then fled to the car, which Avila floored to Lopez's house. They parked the car in Lopez's backyard to conceal it and hung out at Lopez's house for about two hours. Martinez left by himself with "China."

The statement the government obtained from Carroll is virtually identical to Lopez's. The statement from Martinez, which was taken more than a year after Carroll's and Lopez's and nearly two years after the Sotelo murder, differs somewhat. According to Martinez, Lopez cocked the gun and handed it to him right before Martinez began shooting the rivals, who Martinez stated were walking toward them. Martinez also reported that he left Lopez's house with everyone else and left "China" there.

After obtaining these statements, Salem filed a revised motion for new trial. The district court ordered briefing from both sides and held a hearing to address the motion. Salem argued that the evidence implicating Lopez in the Sotelo homicide was admissible and would have been favorable to him because "[i]t would have tended to show Lopez's understanding that he received special treatment in a pass from prosecution for his involvement in a homicide—even in the absence of an explicit agreement between himself and the government. It would have revealed a reason for Lopez feeling indebted to the prosecution and obliged to

assist and please the government by providing informa-
tion about Salem, in whom he knew law enforcement
was interested." Salem acknowledged that he had the
opportunity to expose Lopez's biases, but contended
that the new evidence better "reflected Lopez's motive
to lie and to curry favor with the government."

The government argued that the Sotelo evidence
was inadmissible extrinsic evidence of bad behavior
that was at best cumulative of the other impeachment
evidence. To support this argument, the government
noted that the Sotelo incident was similar to the predicate
acts of conspiracy to commit murder and attempted
murder with which Lopez had already been charged.
The government reiterated several times that Lopez
was neither promised nor in fact received consideration
for his testimony against Salem. It also contended that
Lopez's testimony was corroborated by other evidence,
and challenged our earlier opinion's allusions to the
death penalty. *See Salem*, 578 F.3d at 689.

The district court concluded that the Sotelo evidence
was not "material" as required by *Brady* and *Giglio* and
denied Salem's motion for new trial. *See, e.g.*, *United
States v. Jumah*, 599 F.3d 799, 808 (7th Cir. 2010) (explaining
that a new trial is required if the government fails to
disclose evidence that is "(1) favorable, (2) suppressed, and
(3) material to the defense"). The district court reasoned
that because the Sotelo evidence "does not meaning-
fully differ from the evidence available to the defense
at the time of trial," and the case against Salem was
strong, questioning Lopez about the Sotelo murder

would have been unlikely to change the outcome of the case. The district court also found that there was no evidence that the government gave Lopez a "pass" on the Sotelo murder in exchange for testimony against Salem, either before or after he took the stand.

## III.

Salem contends that the district court abused its discretion in denying his motion. *See United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007). He maintains that the Sotelo evidence is unlike the other impeachment evidence he had at his disposal during trial and would therefore add much toward his efforts to undermine Lopez's indispensable and uncorroborated testimony. He also argues that the district court incorrectly emphasized the lack of an express agreement between Lopez and the government, concluded that the Sotelo charging decision had been made before Lopez reported the intimidation incident, and relied on the government's assertion that Lopez was charged (or not charged) in accordance with its general policies.

Though these arguments are facially distinct, they are fundamentally interwoven inasmuch as they attack the district court's bottom line: that the Sotelo evidence was not material. We therefore direct our attention to the overarching issue of materiality, addressing Salem's subsidiary arguments as part of our broader discussion.

Evidence is material for *Brady*/*Giglio* purposes "'if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different.'" *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). This does not mean that a defendant must show by a preponderance of the evidence that disclosure of the evidence would have resulted in his acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). He must show only that the evidence "could reasonably be taken to put the whole case in a different light as to undermine confidence in the verdict." *Id.* at 435. This is nevertheless a difficult bar to clear because of the high degree of deference we accord to the district court's determination. *See Palivos*, 486 F.3d at 255 ("We review for abuse of discretion the denial of a motion for new trial based upon newly discovered evidence claimed to violate *Brady*.").

Salem first attempts, as he must, to distinguish the impeachment evidence he had at his disposal during trial from the Sotelo evidence. *See Salem*, 578 F.3d at 688 ("[O]rdinarily, newly discovered impeachment evidence will not warrant a new trial under *Brady*. It's often cumulative of other impeachment evidence presented at trial." (citation omitted)). He argues that the evidence of Lopez's cooperation with respect to the Latin Kings indictment was "unimpressive" in light of the absence of a signed proffer letter, which gave Lopez the ability to "deny any awareness of the ramifications of being a government informant that are typically documented by the parties." In Salem's view, the Sotelo evidence would have been much more effective in "establish[ing] Lopez's position of being beholden to the

government and pressured to please the prosecution in Salem's case." He also contrasts the "heinous" nature of murder with the less harmful RICO, drug, and gun crimes with which Lopez was charged, and further contends that the U.S. Attorney's policy of not seeking the death penalty in murder cases arising in the Eastern District of Wisconsin is irrelevant to Lopez's potential bias because there is no evidence that Lopez knew about it.

These arguments cut to the heart of the materiality inquiry. For if the Sotelo evidence does not amount to "more than cumulative impeachment" evidence, *United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008) (quotation omitted), Salem "can't really make a convincing argument that additional impeachment had a reasonable probability of changing the outcome of the trial," *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997). The district court concluded that the Sotelo evidence was not significantly different from the other evidence used to impeach Lopez, which included charges of predicate racketeering acts including conspiracy to commit murder, attempted murder, and drug trafficking, and standalone acts of drug possession, distribution, and the use of firearms in furtherance of those drug endeavors. We do not see this as an abuse of the district court's discretion.

Salem's attorney thoroughly cross-examined Lopez about the barrage of criminal charges he faced, including "a drug conspiracy involving 5 kilograms or more of cocaine, and 50 grams or more of crack cocaine," distribution of "a controlled substance involving at least 5 grams

of crack cocaine," possession with intent to distribute crack cocaine, and the knowing possession of a firearm in furtherance of a drug trafficking crime, specifically "a 12-gauge Winchester shotgun, and Taurus .22 caliber pistol." She emphasized that Lopez faced life in prison as a result of the RICO charge.

Not only did Salem's attorney have the opportunity to inform the jury of the nature of the charges Lopez faced, she also let the jury know that Lopez was potentially "facing an awful lot of time if [he goes] down on any of these charges," and that he was a "cooperating witness for the Government," who could see to it that "these mandatory minimums will not apply to [him] if [he is] convicted." She also exposed Lopez's past willingness to exploit his status as a cooperator. As the district court colorfully put it during the hearing on remand, Salem's attorney made sure the jury knew Lopez was "in bed with the Government." If Salem wanted to expose Lopez as someone willing to lie to evade harsh punishment, the evidence available at the time of trial made that possible. Questions about another instance of criminal conduct would not have made much difference to Lopez's already fragile credibility. *See Senn*, 129 F.3d at 893 ("The jury knew [the witness] had a lot of warts, and a few more, we think, would not have made any difference.*")*. The district court's conclusion that adding more icing to the impeachment cake would not improve the likelihood that the jury would swallow it was reasonable. *Cf. Ervin*, 540 F.3d at 632.

Salem disagrees. He contends that the Sotelo evidence would have revealed a deeper symbiotic relationship between Lopez and the government because Lopez was never charged in connection with the Sotelo murder. Therefore, he argues, Lopez's bias would have been highlighted more strongly if the jury had heard about the Sotelo murder in addition to the other evidence of his potential bias. But Salem has not demonstrated how the Sotelo evidence would make the inference of bias any more likely. Lopez expressly disclaimed familiarity with the concept of "substantial assistance" and other benefits available to government cooperators; nothing in the Sotelo evidence indicates that testimony would now be changed. Nor does the absence of a signed proffer letter, which Salem explored at trial. And to the extent that the government's charging decision in the Sotelo case may not have been finalized—the parties dispute this point—Salem underscored at trial Lopez's suspicious willingness to cooperate with the government "without knowing what he is accused of," as well as the "yet to be defined" nature of the benefits he could receive from the government.

Salem accurately observes that we emphasized the singular nature of first-degree murder in our earlier opinion in this case. *See Salem*, 578 F.3d at 689. He relies on that discussion to argue that the jury might infer from the Sotelo evidence that Lopez believed he was avoiding the death penalty by testifying against Salem. Salem has presented nothing in support of this theory aside from speculation that someone with Lopez's limited education might assume that the death penalty

would be on the table for the Sotelo murder. He contends that the record does not indicate that Lopez was aware of the U.S. Attorney's policies to charge only triggermen with murder and to refrain from seeking the death penalty because Wisconsin has outlawed it, but he ignores the record's equal silence as to whether Lopez thought that "agreeing to testify meant the difference between life and death." *Id.* Salem took no steps to plumb Lopez's understanding at the hearing on remand. And the record reveals that the jury knew that Lopez already faced life in prison, which certainly gave the twenty-year-old a powerful motive to help the government as best he could. We high-lighted the possibility of the death penalty in dictum in our earlier opinion to underscore the importance of allowing Salem to develop a full record on the matter of the Sotelo homicide, not to guarantee him an other-wise unwarranted new trial.

Salem is likewise correct that Lopez's understanding of an informal tit-for-tat arrangement could be enough to show bias, even without evidence of an actual agree-ment between him and the government. *See Salem*, 578 F.3d at 687; *see also United States v. Martin*, 618 F.3d 705, 728 (7th Cir. 2010). The district court concluded that the record, which lacks evidence of an express agree-ment, also did not demonstrate that Lopez had an under-standing that testifying against Salem would help him avoid murder or aiding and abetting charges. Salem disputes that conclusion, pointing to Lopez's testimony that a state detective mentioned Salem's name to Lopez in June or July 2005 as part of the state's efforts to

identify members of the Latin Kings. That testimony, Salem claims, shows that Lopez knew he could stay on the government's good side—and avoid prosecution for the Sotelo murder—by making up a story and helping it take down Salem. The district court thought such an inference was too tenuous to have a material impact on Lopez's credibility, particularly in light of the extensive charges pending against him notwithstanding his cooperation and the potential for bias associated with his desire to face less time on those charges. This was not an unreasonable conclusion, given Lopez's confusion about the mention of Salem's name and Salem's failure to draw attention to this potential source of bias during closing argument.

## IV.

Salem has not demonstrated a reasonable possibility that the outcome of his trial would have been different if he had been able to impeach Lopez with the Sotelo evidence in addition to the other evidence of bias. To be sure, Lopez's credibility was crucial to the government's case. *See Salem*, 578 F.3d at 688. But Salem has not shown that the Sotelo evidence would be more effective at impugning Lopez's credibility than the previously available impeachment evidence. Salem raised the inference that Lopez had a strong motive to curry favor with the government and took great pains to paint him as an unreliable, biased witness. The district court did not abuse its discretion in concluding that evidence of additional possible sources of pro-government bias would

have been largely cumulative of Salem's impeachment efforts and therefore was immaterial for the purposes of *Brady*.

AFFIRMED.