NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 4, 2020
Decided August 6, 2020

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 18-3114

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Western District of Wisconsin. |
| *v.* | No. 3:17CR00082-001 |
| HARRY MILLER, | William M. Conley, |
| *Defendant-Appellant*. | *Judge*. |

**O R D E R**

Harry Miller was convicted of sex trafficking and maintaining a drug house. After the trial, his attorney obtained law-enforcement records showing that a local undercover investigation of Miller had not spotted evidence of these crimes. Miller moved for a new trial, arguing that the government violated his rights under the Due Process Clause and *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn this information over to him before trial. The district court denied the motion, explaining that the evidence about the local undercover investigation was neither favorable to Miller nor material to his defense. We affirm the judgment.

**I**

The government charged Miller with two counts of sex trafficking, 18 U.S.C. § 1591(a)(1), and one count of maintaining a drug house, 21 U.S.C. § 856(a)(1). For the sex-trafficking counts (the focus of this appeal), the government accused Miller of using force, threats, and drugs to coerce Alishayna Daniels and Emily Breitzke, both heroin addicts, to engage in commercial sex acts. He allegedly did so from about late February to mid-June of 2017, when the women lived with him in a studio apartment in a commercial building in Madison, Wisconsin, where Miller worked.

## A.  Pre-Trial Proceedings

Through discovery, the defense learned that local law enforcement officers had conducted an undercover investigation of Miller's building during part of the time described in the indictment. At defense counsel's request, the government revealed the undercover officer's name: David Mertz. The government also disclosed other discovery materials during the week before trial, prompting Miller to move for a continuance. He was concerned, in part, that Thomas Roloff, the local detective working with the government, had failed to disclose *Brady* materials arising from witness interviews. The district court denied the motion but ruled that Miller could question Roloff under oath before trial. The government then sent the defense a statement from Roloff about the undercover investigation. In it Roloff asserted that he had "no reports" to disclose because "there was no information gathered of any substance"; Mertz was at the building only "a few times"; and the investigation was "related to another case" that "never really took off."

Equipped with this information, defense counsel questioned Roloff about the investigation before the trial began. Roloff testified that Mertz "didn't have a lot of contact with people" at the property, never reported "any criminal activity," and did not generate reports because "nothing … took place that warranted a report." His office had one video recording of Miller walking in the parking lot but did not have surveillance video from the property. Based on Roloff's testimony, the district court ruled that the government had fulfilled its disclosure obligations.

## B.  Trial

The government put on several witnesses to show that Miller abused Breitzke and Daniels, "controlled [their] access to heroin to gain power over them," and then

"forced them to sell their bodies" for his financial gain. Both victims took the stand. Breitzke testified that she lived at Miller's studio from late February 2017, when she went there for heroin, until shortly before her arrest in mid-June. She said that on her first night there, she posted a sex ad on Backpage.com (using the name "Diamond") to get money to pay Miller for heroin. After that, Miller "repeatedly" told her to post ads, and she had multiple "dates" each day. She was not allowed to turn down "dates," and Miller told her that if she did not post more ads or tried to leave, he would beat her, withhold heroin to make her sick, or have her arrested on her outstanding warrants. Breitzke said that she was not allowed to leave his studio, and that once when she tried, she "got pulled back in."

Daniels had a similar story to tell about the three weeks that she stayed at Miller's studio during March 2017. She initially went there to get heroin; Miller fronted her $20 worth of drugs, and she posted a Backpage sex ad to get money to pay him back. A few dates netted her about $800 or $900, which she split evenly with Miller and Breitzke to buy more drugs. The next day, Miller told her that she owed him another $300 and that she could not leave until it was paid off. Daniels testified that she posted ads "[a]t least once a day" and had at least three "dates" a day; she was required to give all the money to Miller. Miller sometimes withheld drugs until Daniels showed him text messages confirming that a "date" was on the way. He also threatened her dog and strangled or hit her, including once when he thought that she was trying to leave. Eventually, fearing for her dog's safety, Daniels called her mother, who in turn called the police. After some cajoling to get Daniels to leave the building (she said she "panicked" when police arrived, believing Miller would "have [her] killed" if she left), she came out and was arrested on outstanding warrants.

The jury also heard from five other witnesses who are relevant here. First, Fawne Granby, the mother of Miller's son, testified that in March 2017, she saw a woman named "Emily" on the floor of Miller's studio. Miller said that "she just wants more dope." Granby also heard Miller call Emily a "whore" and tell her that "she wasn't out there making enough money." Once, Granby said, Emily wanted to leave with her, but Miller "pulled her in the door" and said "You ain't taking my 'B' with you." Second, the jury heard from Matthew Reminoski, a heroin addict who said that he lived at Miller's place for about a month starting in mid-June 2017. He described Miller as "very controlling over [Breitzke] and her body and her money and just everything." He heard Miller instruct her to exchange sex for money, ask her if she had posted ads, and abuse her. He said Breitzke (whom he also knew as "Diamond") was "very, very unhappy" and in "very bad shape" physically. Third, Seth Schumacher, another heroin addict,

testified that he saw both Daniels and Breitzke at Miller's studio and heard Miller ask if they had any dates, threaten to withhold drugs from Breitzke until she found a date, and warn her that he would punch her "if she didn't get him money." Fourth, a police officer who in late June 2017 responded to a call from Miller about a disturbance was able to connect Miller to a phone number. Finally, a Backpage paralegal testified about the 115 postings associated with that phone number.

Defense counsel cross-examined these witnesses to show inconsistencies in their stories and motives to lie. When all is said and done, the defense theory was that the two women were willing prostitutes, and so the essential element of coercion was missing. The defense portrayed Daniels and Breitzke as drug addicts and sex workers who "made up a story" about sex trafficking "to avoid going to prison"; the other witnesses were also addicts facing criminal charges with reasons to fabricate events. Breitzke, who testified that she was not allowed to leave Miller's studio, admitted that she stayed a few nights elsewhere and took a trip out of town. Daniels, who said that Miller forced her to post sex ads daily starting in late February, admitted that once she did not post for a week straight. The earliest ad in evidence was from late March. Daniels also admitted that she did not tell authorities she was a trafficking victim until two months after her arrest, when she was facing burglary and forgery charges. Granby admitted to a forgery conviction and past drug use. Reminoski admitted that he has felony convictions and several pending charges, that he sometimes lies (including to the police about when he stayed at Miller's), and that he spoke to federal authorities only after receiving assurances that nothing he said could be used against him in court. Schumacher acknowledged that he and Miller had had a falling out, that he was cooperating with the government, and that he had cooperated in a past case for a lighter sentence. Finally, the officer who responded to Miller's call about a disturbance at the building testified that he did not see anything "suspicious" there and agreed that he likely would have followed up if he had suspected human trafficking.

In closing, defense counsel observed that, aside from one local officer who "saw no signs of human trafficking" despite being "attuned to it," the government did not put any officers on the stand to testify about what they saw at Miller's building. Counsel conceded that a conviction was proper on the drug charge but argued for an acquittal on the sex-trafficking counts.

The jury convicted Miller on all counts. Later, the court sentenced him to 20 years in prison followed by 15 years' supervised release.

## C.  Post-Trial Proceedings

After trial, Miller subpoenaed the records from the local undercover investigation of the building where he lived, despite the fact that the government earlier had assured him that they were unrelated to his case. The government turned over a file that included Officer Mertz's notes detailing his undercover efforts from April 28 to June 30, 2017; about seven hours of recorded conversations, including several with Miller; and two short videos, one of which shows Miller in the building's parking lot.

Mertz's notes reveal the following: During his first visit to the building on May 1, he saw a man named "Seth" working on surveillance cameras. Mertz rented an office on the first floor of the building on May 24 and visited the property eight times after that, sometimes with another undercover officer. On May 25, he got a key from Miller, and they talked about Miller's work, his son, and a tattoo shop opening in the building. On June 1, he overheard Miller tell "some female" to "keep 'him' waiting as long as possible," a possible reference to a man who drove into the parking lot soon after. Later that day, Mertz called Miller and "talked with a female who goes by Diamond." On June 30, Mertz wrote that he walked up to the second floor and knocked on Miller's door to return a key; Miller came out, got the key, then went back inside.

Miller moved for a new trial on the sex-trafficking counts. See FED. R. CRIM. P. 33. He argued that the government's failure to disclose these reports before trial violated due process and *Brady*. Noting that "[n]owhere in Mertz's notes or in the audio recordings is there any evidence that Miller was holding women against their wills for prostitution," he argued that the lack of incriminating evidence is itself exculpatory. Had he received this evidence before trial, Miller said, he would have called the undercover agents to testify that "they never observed Miller coerce anyone into sex work." Alternatively, he asked the court to order Roloff to turn over all of his case files relating to the investigations of Miller. The government responded that the undercover evidence was not favorable, material, or "suppressed" under *Brady*.

The district court denied the motion, ruling that no *Brady* violation had occurred because the records were neither favorable nor material. Although the government "[c]onced[ed]" that it had not produced the records before trial, the court found that the evidence was not relevant: Mertz never visited the building while Daniels was being trafficked; he did so only a few times during Breitzke's ordeal; and he never claimed to have entered Miller's studio. Accordingly, "the fact that [Mertz] saw nothing that he deemed incriminating or worthy of a report does not render the information he learned

there 'favorable.'" Further, the court explained, a defendant may not seek to establish innocence on one occasion by the absence of criminal acts on another. Moreover, some of the reports could be seen as inculpatory, because they corroborated testimony placing certain people on the scene. The court concluded that given "the strength and amount of the government's evidence" at trial, "testimony from Mertz that he and his fellow officers saw no evidence of sex trafficking … would not have had a reasonable probability of changing the verdict." Nonetheless, out of an abundance of caution, the district court ordered the government to produce Roloff's case files for defense counsel's review. After that review, the court found "no new basis" for a *Brady* violation and denied the motion for a new trial.

## II

Miller appeals the district court's denial of his motion for a new trial, a decision that we review for an abuse of discretion. *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018). To obtain a new trial based on a *Brady* violation, Miller had to show that the undercover records were (1) willfully or inadvertently suppressed by the government, (2) favorable to him, either because they are exculpatory or impeaching, and (3) material to the defense, meaning there is a reasonable probability of a different result had they been disclosed before trial. *Banks v. Dretke*, 540 U.S. 668, 691, 699 (2004).

### A. Suppression

The district court implicitly concluded that the government, by failing to disclose the investigatory records in time for Miller to use them at trial, suppressed them within the meaning of *Brady*. See *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). The government insists that Miller knew about the records and, with diligence, could have obtained them before trial. This strikes us as a stretch: when Miller asked about the investigation before trial, the government's response—that the undercover work was "related to another case" and that there were "no reports" to turn over—obfuscated the nature of the investigation. See *United States v. Salem*, 578 F.3d 682, 685 (7th Cir. 2009) But we need not dwell on this point, because in order to prevail, Miller must meet all three criteria identified in *Banks*, and as we now explain, he has not.

### B. Favorability

We first address the question whether the missing evidence was favorable to Miller, either for his case-in-chief or for impeachment. Miller contends that the district

court "applied the wrong legal standard" because it wrongly thought that he wanted to use the undercover reports as favorable character evidence. In fact, he wanted to use them to bolster his argument that "had the witnesses' tale occurred certain facts would have been witnessed by *any* bystander," including undercover agents. The lack of observations, by this alchemy, turns into favorable evidence. But the district court did not misconceive Miller's argument; it just disagreed with his contentions about the significance of not detecting criminal activity.

Miller next argues that the district court unreasonably found that the reports were not favorable to him. But we share the district court's assessment. It is notable that the undercover investigation barely overlapped with Miller's trafficking activities. Mertz first visited the building more than two months after Daniels left the property, and so he could not have seen trafficking involving her. And although the investigation partly coincided with Miller's trafficking of Breitzke, Mertz was at the property only seven times then, and he approached Miller's second-floor studio (the site of the trafficking) only once, in late June, *after* the trafficking had concluded. His opportunity to observe any alleged trafficking was thus limited at best. Nothing in Mertz's notes or the audio recordings show that Miller did *not* engage in sex trafficking. In arguing that the absence of incriminating evidence is itself exculpatory, Miller assumes that if forced prostitution was occurring there, the undercover investigators would have detected it. But Miller provides no reason to believe that Mertz, who only periodically visited the building, was there at the key moments, such as when a "date" arrived or left, or when Breitzke tried to leave. (It also is not evident that the officers were "looking for evidence of human trafficking," as Miller asserts, or for something else.) We also agree with the district court that some of these records are actually inculpatory because they partially corroborate testimony from government witnesses. For instance, Mertz noted the arrival of a man who drove up shortly after Miller told a woman to "keep him waiting as long as possible," which is consistent with testimony describing Miller's trafficking activities. Mertz also saw Miller, "Seth" (presumably Schumacher), and "Diamond" (Breitzke) at the building during the relevant time.

## C.  Materiality

Even if the evidence were favorable to Miller, he still must show materiality. Determining materiality requires the court to assess whether there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal citations and quotation marks omitted). This standard is met when "the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Miller argues that the district court considered only the government's evidence when assessing materiality and ignored how the withheld evidence "would have bolstered the defense's argument that there was no support for the witnesses' stories." This argument fails for two reasons. First, materiality is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. Nothing requires a district court exhaustively to discuss both sides of the case to prove that it considered everything. We will not assume that the district court failed to consider the entire record simply because it did not address each arguable weakness in the government's case. See *United States v. Morales*, 746 F.3d 310, 316 (7th Cir. 2014); *United States v. Lewis*, 567 F.3d 322, 328 (7th Cir. 2009).

Second, and more fundamentally, Miller's argument that there was nothing in the record to corroborate the witnesses' stories minimizes much of what the jury heard. Among other evidence, the jury heard directly from both victims, who told similar tales of coercion and abuse, and from several eyewitnesses, who largely backed up the victims' accounts. To be sure, most of the witnesses were drug addicts facing criminal charges, and their stories are not fully consistent. But defense counsel hammered these points at trial (in addition to noting that an officer dispatched to the property did not suspect human trafficking), and the jury nonetheless believed the key elements of the witnesses' stories. The district court thus reasonably ruled that it was "highly unlikely" the jury would have reached a different verdict if it had heard undercover agents testify about what they did not observe at the building. That determination holds significant weight, as the trial court is "best equipped to 'develop[] a feel for the impact of the witnesses on the jury—and how that impact might have been different had the government played by the rules' and disclosed the suppressed evidence." *Ballard*, 885 F.3d at 505 (citation omitted). Viewing the record as a whole—including the weaknesses that Miller has identified—we see nothing unreasonable in the district court's ruling.

We therefore AFFIRM the judgment.